## SPANG v. RAINEY.

### (Circuit Court of Appeals, Second Circuit.   February 23, 1897.)

1. SALES—MEANING OF "GENERAL ADVANCE IN MARKET PRICE."
    Under a contract for the sale of coke at 90 cents per ton, "said price to continue until there may be a general advance in the market price of coke, then and in that event the price to be the lowest rate at which coke is sold to the larger and better consumers of coke in the market," the expression "general advance in the market price of coke," must be regarded as meaning a general advance over the 90 cents per ton named in the contract, and not a general advance over what was the market price of coke at the time the contract was made.

2. SAME.
    In determining whether there has been "a general advance in the market price of coke," within the meaning of the contract, proper regard must be given to all the different ways in which coke is bought and sold, and the advance, to constitute a general one, must be such according to the trade acceptation, and the general understanding of buyers and sellers, and not a special advance by a limited number of dealers, or by a combination taking advantage of the necessities of a limited class of customers.

3. SAME—MEANING OF "LOWEST RATE TO LARGER AND BETTER CONSUMERS."
    The obligation to pay plaintiff the lowest rate paid by the larger and better consumers does not mean absolutely the lowest rates paid by any consumer, but the lowest rates prevailing among such consumers in general.

This is a writ of error to the circuit court, Southern district of New York, to review a judgment of that court entered April 21, 1896, against the plaintiff in error, who was defendant below. The judgment was entered upon the verdict of a jury in favor of defendant in error, who was plaintiff below.

John E. Parsons, for plaintiff in error.
Wm. B. Hornblower, for defendant in error.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.   The defendant was one of several partners who owned and operated a furnace under the name of the Isabella Furnace Company, and the action was brought to recover the price of coke delivered by the plaintiff under the following contract:

"Memorandum of agreement made this third day of May, eighteen hundred ninety-four, and to continue until the third day of February, eighteen hundred ninety-five, by and between W. J. Rainey, of Cleveland, Ohio, and Isabella Furnace Co., of Pittsburgh, Penna.: The said W. J. Rainey bargains and agrees to supply the said Isabella Furnace Co. coke to the extent of about fifteen car loads daily, at the rate of ninety (90) cents per ton of 2,000 pounds, railroad weight, at the mines in the Connellsville region,—good, merchantable coke, equal to the best made by the said W. J. Rainey. Said price to continue until there may be a general advance in the market price of coke. Then and in that event the price shall be the lowest rate at which coke is sold to the larger and better consumers of coke in the market. Settlements to be made in cash, say the 25th of the month following previous month's delivery. This contract to be held in abeyance in the event of strikes, or the inability of W. J. Rainey to produce coke.

"W. J. Rainey, per W. T. Rainey.
"Isabella Furnace Co."

There was no dispute as to the quantity delivered under this contract. The jury found the price payable therefor to be 90 cents up to May 10, 1894, $2.50 from that date to and including June 30, 1894, and $1.50 from that date to and including August 4, 1894, the date of the last delivery. The matters in dispute upon the proofs were whether there had been a "general advance in the market price of coke," within the meaning of the contract, and, if so, what, at the time of the several deliveries, was the "lowest rate at which coke was sold to the larger and better consumers." With the weight of the evidence bearing upon these points this court has no concern. That is a matter for the consideration of the trial judge upon motion for a new trial, and his disposition of such motion is not reviewable by writ of error. The only questions to be determined here are whether there was any evidence to go to the jury sustaining the plaintiff's contention; whether the case was submitted to the jury with correct instructions: and whether there was any harmful error in the admission or rejection of evidence.

It is assigned as error that the court refused to instruct the jury that by the expression, "a general advance in the market price of coke," as used in the contract, is meant a general advance over what was the market price of coke at the time the contract was made, on May 3, 1894, and not simply over the 90 cents per ton named in the contract. We see no reason for giving any such forced and awkward construction to the instrument. The contract evidently provides for a price initially of 90 cents, but which is to advance or recede (not in any event below 90 cents) so as to conform to the general market price, i. e. to the lowest market rate paid by the larger and better consumers. There was abundant evidence that, subsequently to the making of the contract, coke was bought by the larger and better consumers at prices above 90 cents, and as high as those found by the jury. To understand the theory upon which defendant contends that these purchases should not have been considered by the jury, it is necessary briefly to state some peculiarities of the business which were disclosed by the testimony. The great bulk of the output of coke from the region in question was supplied by three concerns,— the H. C. Frick Company, the McClure Company, and the plaintiff. There were some smaller concerns which produced it in limited quantities. The coke is bought by those who operate blast furnaces, and is absolutely necessary to the running of such furnaces. Since the assurance of a steady supply is important to the furnace men, they undertake to secure it in most cases by making contracts with the coke producers for deliveries of specified quantities during some specified time,—either a year or some fraction of a year. The price is definitely fixed in these contracts at some uniform rate, which presumably is what the seller thinks he can safely sell at, averaging any expected differences in the cost of production during the period. These are spoken of in the record as "time sales" or "time contracts." If, however, for any reason, a user of coke needs more than he can obtain under his time contracts, either because he is using more than he has provided for, or because he is not receiving all he bargained for under such contracts, he goes into the market and buys what he needs for

immediate delivery, or for delivery during some short future period. How much he will thus buy depends upon his needs,—that is, upon the amount of shortage he has to make up,—and no doubt, to some extent, upon the price he may have to pay for it. These sales are referred to in the record as "spot sales" or "emergency sales." The time contracts contain a strike clause similar to that which is found in the contract in suit, so that purchasers of coke can never be sure that they will receive all they have provided for under their time contracts at the price fixed therein. They are liable at any time, in the event of a strike, to be compelled to pick up their coke where they can, and at prices regulated by the supply and demand. At the time the contract in suit was made, a strike was on, and its effect began to be felt immediately. During the month of May the H. C. Frick Company was able to produce only 2,557 car loads of coke, as against an ordinary running capacity of 19,000 to 22,000 car loads. Its condition improved subsequently, but even in the month of July it was able to produce barely 50 per cent. of its regular output. The consequence was that although the blast furnaces which it had contracted to supply were short of coke, were demanding coke, and in some cases had to stop business because they did not have coke, the Frick Company was obliged to avail of the strike clause in its existing contracts, not being able to carry them out except as it was protected by such clause. It disposed of the coke it did produce by distributing it around among such of its regular time customers as, for some sufficient reason, it chose to favor, at the price it had agreed to charge. The strike greatly reduced the output of the McClure Company. It also supplied some little coke under time contracts at a fixed rate, and, in the case of one time contract, at market rates, under which deliveries were made at $1.10 and $1.25. But apparently it made no other sales. Except for the sales, or rather the deliveries, under time contracts of the H. C. Frick Company, and these transactions of the McClure Company, the testimony as to sales and prices during the period in question relates to so-called spot or emergency sales. So large is the plant of the H. C. Frick that, despite the great reduction in its output, its deliveries during that period exceeded those of all other producers put together. This circumstance, however, would not justify the request to charge which the circuit judge refused, viz. that the jury cannot adopt any higher rate than that at which the H. C. Frick Company sold to its customers during said period. Other considerations than such as usually fix the price of a commodity, viz. the supply and the demand, may well have operated to induce the continuance of deliveries under these contracts at less than general market price, just as they undoubtedly did induce the favoring of some of its customers by letting them have coke when none was delivered to others. Upon all the evidence as to market price, the court charged most favorably to defendant, as will be seen from the following excerpts:

"Now, looking at this contract as a whole, what was the apparent intention of the parties? Mr. Rainey had the right at any time to cease supplying coke, in the event of a strike; but certainly it can hardly be believed that it was the intention to permit Mr. Rainey, instead of availing himself of that condition, to produce a market price himself, and compel the defendants

to accede to it. It was intended—and the words used are significant—that, if there was any 'general advance' in the market price, then that should be the basis of the further price to be paid by the defendants. Not a special advance made by Mr. Rainey, or by any combination, if you please, who, by reason of exceptional circumstances, might temporarily create a corner in the market, or take advantage of the necessities of a limited class of customers; but it was to be a general advance in the market, according to the trade acceptation and the general understanding of buyers and sellers. The first question for you to determine in this case is whether there was this advance. The plaintiff insists that there was a general advance, commencing on the 10th of May; and upon that theory he insists that he is entitled to recover $3 a ton for the coke during the months of May and June, and $1.50 for the coke in July and the rest of the time through which the deliveries were continued. It is incumbent upon the plaintiff to establish by a fair preponderance of evidence—the burden of proof being upon him—that there was a general advance in the market price of coke, within the meaning of the contract, as I have explained that meaning to you. That is the fundamental proposition which it is incumbent upon him to establish. The first issue, therefore, for you to determine, is whether there was a general advance,—not an advance created merely by Mr. Rainey, or created by a limited number of dealers, neither an advance in which all sellers and buyers participated, but a general advance, in the acceptation and understanding of dealers in coke. I shall not advert in any detail to the evidence on that question. Mr. Rainey has given evidence as to many transactions of his own, some of which were with large consumers, and has produced the evidence of other persons in support of the theory that this advance took place. On the other hand, the defendants have produced their witnesses. Perhaps I ought to refer to the testimony of Mr. Magee, as he represented the largest coke producer in the country [the H. C. Frick Company] during the life of this contract. Mr. Magee testified that there was no advance. In June, according to his testimony, the production of his concern increased considerably, and it increased more in July, but the concern could not fill its contracts. It was not under obligation to fill its contracts, because, as seems to be the case with all these contracts, there was a strike clause inserted in them. But nevertheless, according to his testimony, his company did go on distributing coke as best it could among its customers, and renewing contracts made several months before, some of which expired in June and some in July,—renewing these contracts on the basis of a dollar per ton for coke. I shall not refer to the other testimony on the part of the defendants. I leave it to you, as a question of fact, to say whether, within the meaning of the contract as I have explained it to you, there was a general advance in the market price of coke during the life of the contract between the parties. If there was, then you reach the second question in the case. If there was a general advance in the market price, then under this contract the defendants were obligated to pay the plaintiff the lowest rates paid by the larger and better consumers. That does not mean absolutely the lowest rates paid by any consumer, but it means the lowest rates prevailing among such consumers in general."

The defendant assigns it as error that the court charged as above:

"That in determining the market price the jury must consider what consumers were willing to pay in the regular course of business. A general advance in price means a state of demand and supply which leads the larger and better consumers in general to pay the advance."

It is contended that this clear and ordinarily accurate statement of what constitutes a "market price" was improper in this case, because it did not exclude all spot sales from the consideration of the jury. Upon the theory that spot sales were to be wholly disregarded, defendants asked the court to instruct the jury that there was no general advance, or that the "lowest rate," under the contract could not exceed one dollar per ton, which was the rate at which the

Frick Company sold to its customers.	Defendant also requested the court to charge:

"That, in considering this question as to whether there was or was not a general advance in the market price of coke, the jury are not to adopt as a criterion of market price the high prices obtained by the plaintiff at spot sales or emergency sales of coke, nor the increased cost to the plaintiff or others of producing coke."

The court modified this request, and instructed the jury:

"That, in considering the question whether there was or was not a general advance in the market price, the jury are not necessarily to adopt as a criterion of market price the high prices obtained by the plaintiff at spot sales or emergency sales, or the increased cost of producing the coke, but the jury are to take into consideration all the facts which have been recited."

To which defendant excepted.	Defendant's theory was further advanced in a request which the court refused to charge:

"That the jury are to bear in mind that the contract in this case is a contract running for nine months, and they must look especially to see whether there was any advance in prices in like contracts, and, if so, how much."

We find nothing in the contract which will warrant the construction defendant seeks to put upon it.	It refers to "a general advance in the market price of coke," not an advance exclusively in one-year coke, or in nine-months coke, or in six-months, or in three or two or one, or in spot.	Proper consideration may be given to all the different ways in which coke is bought and sold, and the determination what the general market price is at any particular time cannot be properly arrived at without considering all.	If at one time all the purchasers buy under time contracts only, and there are no spot sales at all, naturally the price under time contracts would be the only one to consider.	If at some other time the purchasers cease to procure any coke under time contracts, and buy what they need at spot sales, the price of spot coke would be the only one to consider, for on such sales only would buyers and sellers come together to make a market.	Evidently the jury in this case reached the conclusion that this was exactly the situation; that the deliveries under old contracts to a favored few were not transactions of a kind to make a general market, and that the real price was to be found where persons unsupplied with coke, and wishing to purchase, encountered those who had coke and were willing to sell.	The evidence in the case would fairly warrant such a conclusion.	Defendant refers to authorities holding that the retail price is not to be taken by a jury as the market price, in settling transactions between litigants concerning wholesale quantities.	But if the supply of any particular commodity should be so greatly reduced that buyers generally who were accustomed to purchase it by the thousand could only procure it by the ten, the market price would be that produced by their demand, although, relatively to their former transactions, the quantity bought by each purchaser might be insignificant.	The charge correctly defined the phrase "a general advance in the market price," and the exceptions to refusal to charge as requested are unsound.

Defendant further requested the court to charge:

"That the price for which Frick & Co., the largest producers of coke in the Connellsville region, and who supplied more coke to the market than any other producer during the period from May 3, 1894, to August 4, 1894, sold their coke, should have great, if not controlling, weight with the jury in determining whether or not there was a general advance in the market price of coke."

The court had sufficiently instructed the jury as to this evidence in the clause above quoted from the charge, referring to the testimony of Magee. For the reasons already stated, we do not think it was entitled to any great weight in determining whether or not there was a general advance in the market price, in view of the statement of the witness that they sold only to their regular customers under contract, trying to strain a point so as to oblige any person who had been a customer for any length of time, and whose situation was such that he was in great distress, and that the Frick Company chose to sell only to such customers, and at one dollar a ton. the price already agreed upon, when, as the witness conceded, if they had offered coke on the market they could have got more for it than their old customers paid them.

We find no harmful error in the admission of evidence of actual sales, which was excepted to, in view of the fact that when the case was finally closed on both sides the jury had been furnished with the facts as to substantially all sales of Connellsville coke to the larger and better consumers during the entire period in question. The judgment of the circuit court is affirmed.