CONSOLIDATED GAS ELECTRIC LIGHT & POWER CO. OF BALTIMORE v. UNITED RAILWAYS & ELECTRIC CO. OF BALTIMORE et al.

No. 3823.

Circuit Court of Appeals, Fourth Circuit.

Argued February 4, 1935.

Decided April 2, 1935.

Charles Markell, of Baltimore, Md. (Cook & Markell, of Baltimore, Md., on the brief), for appellant.

Charles McHenry Howard and Edgar Allan Poe, both of Baltimore, Md. (Joseph C. France, of Baltimore, Md., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and McCLINTIC, District Judge.

PARKER, Circuit Judge.

This is an appeal from an order in the receivership proceedings of the United Railways & Electric Company of Baltimore, Md., and its subsidiary corporations, in which the court below passed upon two claims, one for electric power furnished those corporations prior to receivership, and one for power furnished the receivers. The prereceivership claim was for $509,899.65 for power furnished within the six months immediately preceding receivership, calculated at the rate of 9½ mills per kilowatt-hour, without allowance for payments on account or interest. The claim against the receivers was for power furnished from January 6, 1933, to April 30, 1934, upon which the claimant had been paid, at the rate of 9½ mills per k. w. h., the sum of $1,678,977.77, subject, however, to an agreement for adjustment in the event that the court should hold this rate improper in passing upon the contract under which the pow-

er was furnished. The court held that the original contract between the claimant and the companies in receivership had been abrogated by mutual consent, that the claims must be adjudicated upon the basis of implied contract, and that a reasonable price for the power furnished was 7½ mills per k. w. h. The prereceivership claim was therefore allowed in the sum of $402,552.-55, with priority accorded it under the six months' rule, and the claimant was ordered to refund $353,469.00 of the amount collected from the receivers on the 9½ mills per k. w. h. basis. It was further ordered that future payments for power by the receiver until further order of court should be on the basis of 7½ mills, unless the Public Service Commission of Maryland in the exercise of its rate-making power should establish a different rate. From this order the claimant, the Consolidated Gas Electric Light & Power Company has appealed.

Prior to 1921, the United Railways & Electric Company of Baltimore, which we shall refer to hereafter as "United," and which is sometimes referred to in the contract from which we shall quote as "Railways," was generating electric current in its own powerhouse at Baltimore and had a fifteen-year contract, which expired in 1926, with the Pennsylvania Water & Power Company for the supply of hydrogenerated current at 3.3 mills per k. w. h. The claimant, which we shall refer to hereafter as "Consolidated" and which is referred to in the contract as "Electric," was engaged in the manufacture and sale of electric current in Baltimore. In January, 1921, these two corporations entered into a contract, under the terms of which Consolidated purchased from United its power producing plant at the price of $4,000,000, took over its contract for purchasing current from the Pennsylvania Water & Power Company, and agreed to sell to United all of the electric current which United might need at prices to be fixed in accordance with the rather complicated standards provided by the contract. This contract was filed with the Public Service Commission of Maryland which approved it, without, however, passing upon the rates which it prescribed. The contract bound the Consolidated to furnish and the United to accept and pay for electric current over a period of fifty years. For the first five years of this period prices were based upon the contract with the Pennsylvania Company and no controversy has arisen with regard

thereto. Prices after the expiration of the Pennsylvania contract were to be fixed in accordance with article XII of the contract, which is as follows:

"During the term of this contract, after the first period ending February 7, 1926, all power and energy required by Railways is to be furnished by Electric, and the price to be paid by Railways to Electric for such power and energy is to be based upon the total cost to Electric of producing power and energy in its generating stations, including fixed charges covering interest (equal to the actual cost of money) on capital invested in said generating stations, depreciation, taxes and insurance, together with such income, sale, or similar taxes as may be assessed against Electric by State and National Governments, as applied to the sale of power and energy to Railways, or the income received by Electric therefrom, and through the purchase of power and energy from power, or any other source of supply mutually agreed upon, and an amount added to Railways' share of said total cost to cover a reasonable profit to Electric, excluding in the calculation of said profit all of said income, sale, or similar taxes, as hereinafter provided. The apportionment to Railways of said total cost is to be in proportion to Railways' demand for power and consumption of energy in the ratio which Railways' consumption of energy bears to the total energy produced and purchased by Electric.

"It is the intent in establishing the price to be paid for power and energy by Railways that Railways and Electric shall both benefit by the production and supply by Electric of all the power and energy required by Railways and Electric, and that the total cost of energy and power shall be divided fairly between the said two parties.

"On the assumption that the production of the entire supply of energy and power by Electric will result in a lower cost of production than that which would result from the independent operation by Railways and Electric, it is agreed that on the Railways' share of the total cost of operation, apportioned to Railways as in the foregoing paragraph, Electric should receive a profit of ten per cent.

"In the event, however, that under the operation by Electric of the entire production and supply, with the aforesaid apportionment of costs the cost to Electric, in-

cluding all fixed and operating charges, for Electric's own requirements for power and energy should exceed that which the said supply for Electric would cost were Electric to continue separate operation, then Railways shall pay in addition to the said apportionment an amount which will result in a net cost to Electric for its required portion of the total supply, which shall not be greater than the cost of the same supply were independent operation by Electric continued, and on this greater apportionment of cost to Railways, Railways shall likewise pay to Electric a profit of ten per cent.

"A complete operating agreement for fixing a definite basis for prices for power and energy based upon the general understanding outlined in this Article shall be entered into promptly hereafter by the parties hereto, such agreement to be attached hereto and made a part hereof, and marked Exhibit B.

"In establishing prices to comply with the foregoing conditions as to costs and apportionments, periods of less than one year shall not be considered, and it is also understood that the best possible operating conditions should be maintained by mutual advice and co-operation.".

The operating agreement, referred to in this paragraph, provided that tentative billing rates should be determined in January of each year for the current calendar year, that payments should be made monthly on the basis of this tentative billing, and that at the end of the year there should be an adjustment "to correct for deviation of actual from estimated conditions." After each annual adjustment a revised estimate of rates for the ensuing year was required to be made, which was to apply as tentative billing rates for that year.

Article XIV of the contract contains a "most favored customer" clause in the following language: "And, furthermore, Electric does hereby guarantee to Railways that it will always give Railways the benefit of the most favorable rate given to any large customer, considering conditions of service."

Article XXI headed "Economical Generation of Energy" is as follows: "As the controlling reason and motive for Railways in entering into this agreement with Electric is its belief that by efficient and competent management Electric will be able to furnish it with power and energy at a cost less than if produced in its own independent stations, it is hereby acknowledged by Electric that it will use all reasonable diligence, intelligence and foresight in the operation of its owned, leased or controlled stations, that as to additional equipment it will avail itself at all times of the latest developments in the art of generating power and energy, and that in no event is the price to be paid by Railways for power and energy to exceed that obtained by the best of practice in modern steam and hydroelectric stations under similar conditions."

Along with Article XXI, Article III, entitled "Termination of Contract" should be considered. That article is as follows: "Should the rate or price paid by Railways for power and energy substantially exceed at any time during the running of this agreement, the price at which Railways might be able to demonstrate its ability to produce or purchase its entire requirements of power and energy under the then existing processes of the art, and in addition thereto, should Electric fail to avail itself for the joint benefit of the parties hereto of any opportunity to produce or purchase power and energy under conditions which would operate materially to reduce the price paid by Railways under the conditions of this agreement, then Railways may, if it so elects, terminate this contract at any time after February 7, 1935, provided, however, that not less than three years' written notice demanding such termination shall be given by Railways to Electric, and further operation hereunder shall cease thereafter, provided, however, that if Electric shall have been unable after due diligence to sell to other customers an amount of power and energy equivalent in money to the average annual payments made for power and energy by Railways hereunder, then Railways will continue to pay throughout the next three years, following said date of termination, its proportionate share of the fixed charges provided for in Article XII hereof, and provided, further, that as fast as Electric takes on new business not already provided for in plant capacity, exclusive of that for Railways, and provided also that no increase in plant capacity shall unnecessarily be made after such notice is given, taking into consideration the usual amount of reserve capacity, to replace that surrendered by Railways a proportionate abatement shall be made in the payments herein required to be made by Railways."

Article XV contains the following provision relating to the correction of overcharges or undercharges under the contract, viz.: "If it shall be found at any time during the running of this agreement that Railways has been overcharged or undercharged in any form whatsoever under the provisions herein for power and energy, and Railways should have actually paid the bills containing such charges, Electric or Railways shall refund such amount or amounts of overcharge or undercharge within thirty days from the date of the determination of the amount, with interest thereon at the rate of six per cent (6%) per annum from the times respectively when such charges were paid, or should have been paid, until the date of refund, provided, however, that such claim shall be made within twelve months from the date of such overcharge or undercharge."

It is clear that no rate has ever been paid by United based upon Consolidated's interpretation of Article XII of the contract; for it appears that a rate calculated in accordance with Consolidated's interpretation of that Article would be in excess of 12.5 mills per k. w. h. At the end of the year 1926 a controversy as to the rate payable during that year was settled, and it was agreed that beginning with January 1, 1927, the calendar year should be adopted as the basis for billing and settlements under the contract, but no adjustments correcting the tentative billing rate were made until January, 1930. Over this period Consolidated was billing United at figures ranging from 9.36 to 10.311 mills per k. w. h., each bill containing the statement that the rate was tentative; and United was making payment at 9.36 mills per k. w. h. In January, 1930, a settlement was made adjusting the rate which should be paid during the period of the controversy, it being agreed that 9.6 mills per k. w. h. should be paid for the period prior to January 1, 1928, and 9.5 mills per k. w. h. for the years 1928 and 1929. No change was made in the contract, however, and nothing was done towards fixing with any greater definiteness the rate which was to apply for the future, except that the tentative billing rate for the ensuing year was fixed at 9.5 mills per k. w. h. It was understood that the parties would agree upon interpretations and modifications of the contract so as to fix the rate for the future upon a more definite basis, but this was not done. The status in which the matter was left by the negotiations appears from three letters, which, because of their importance, we set forth in full. The first is from Mr. Wagner, president of Consolidated, to Mr. Storrs, chairman of the board of United. It is dated January 17, 1930 and is as follows:

"This is to confirm the result of our talk today in reference to the differences between our company and yours concerning the billing for electric power for the past several years. As a compromise of these differences we have agreed to revise the charges for power for final settlement on the basis of 9.6 mills for the years 1926 and 1927 and on the basis of 9.5 mills for the years 1928 and 1929.

"Later, at our mutual convenience, we will endeavor to get together on possible modifications of the existing contract between us as applying to future power service."

Under date of January 18, 1930, Mr. Storrs answered this letter as follows:

"I have yours of the 17th confirming our talk of yesterday regarding the settlement of power bills for the past several years basing this settlement on the basis of 9.6 mills for the years 1926 and 1927 and on the basis of 9.5 mills for the years 1928 and 1929.

"There remains for consideration the exact date from which any future rates shall become effective; I find that this matter was settled upon in the early stages of discussion as to modifications in the existing contract but you and I have not touched upon the subject in our conversations. We must, of course, decide upon this matter when we meet to discuss the future plans.

"This is in accord with my understanding and I will present it to our Executive Committee at its next meeting."

And on January 20, 1930, Mr. Wagner made the following reply:

"Referring to yours of the 18th, I have the following to suggest: that we should use a tentative billing rate beginning January 1, 1930, of 9.5 mills per k. w. h. The final billing may then be adjusted within the year to conform with such modifications in the existing contract as we may be able to agree upon. The result of this will be that any modification which we may agree upon as to the existing contract will apply to service covering the entire year of 1930."

Following this exchange of letters, monthly bills for power were rendered and

paid on the basis of 9.5 mills per k. w. h.; but each bill, even up to the time of the receivership, bore the annotation "Tentative rate as per Mr. H. A. Wagner's letter to Mr. L. S. Storrs of January 20, 1930." Nothing further was done, however, towards modifying the contract or determining with greater accuracy the rate applicable thereunder. On January 5, 1933 receivers were appointed for the United. They received current from the Consolidated for use in operating United's properties without any further agreement or understanding about the rate to be paid, except that they were given time in various court orders within which to determine whether or not they would adopt the contract of United under which current was being supplied, and in the meantime it was ordered that payments made by the receivers on account of current should be without prejudice to their right to an adjustment of the rates. Claim was presented by the Consolidated for current furnished between August 1, 1932, and the date of the receivership and this was passed upon by the court along with a petition of the receivers that the rate applicable to such claim as well as the rate upon current furnished to the receivers should not be in excess of 7 mills per k. w. h. because of the provisions of Articles XIV and XXI of the contract heretofore quoted.

In support of their contention, the receivers relied upon the rate furnished by the Consolidated under contract with the Pennsylvania Railroad Company, the rate furnished under its Schedule T to its industrial customers, proof as to the cost at which the United could produce power if it should build a new and independent plant of its own at Baltimore, and proof as to the rate at which power was furnished to street car companies in Cleveland, Pittsburgh, New York, and Cincinnati. By the testimony of experts the receivers showed that the terms of the Pennsylvania Railroad contract, if applied to the consumption of power by the United, would result in a rate of 6.99 mills per k. w. h.; that Schedule T would result in a rate of 8.13, that, by constructing an independent plant of its own, United could produce power at 8.40; and that under the rates accorded street railway companies in Cleveland, Pittsburgh, New York, and Cincinnati it would be entitled to its requirements at 6.39, 6.69, 6.75, and 7.73 respectively. There was counter testimony with respect to these matters by witnesses for the Consolidated showing that, when conditions of service were equalized, the rates relied on by the receivers as a basis for their contentions were materially higher than claimed.

As heretofore stated, the judge below held that the contract between the Consolidated and the United had been abrogated by mutual consent, at least to the extent that it provided any basis for determining the rate for current supplied. He therefore proceeded to determine the amount due under the claim and the price to be paid for current by the receivers on the basis of the reasonable value of the current furnished, and, in the light of the testimony to which we have adverted, fixed this reasonable value at 7½ mills per k. w. h. The Consolidated has appealed from the decree based on this finding and contends: (1) That the contract was not abrogated but was modified by agreement so as to fix 9½ mills as the contract price for current until further change; (2) that this 9½ mill rate was binding upon the parties as a rate filed with the State Public Service Commission; and (3) that, with respect to the claim filed under the six months' rule, the acceptance by the United without protest of the monthly bills sent for power furnished gave to the claim for the amount of these bills the status of an account stated. The receivers claim that the decree should be affirmed on the theory adopted by the judge below, and also because the rate of 7.5 mills per k. w. h. is as much as plaintiff is entitled to recover under the contract in view of the provisions of Articles XIV and XXI. We have carefully considered the evidence in the light of these contentions, and we do not think that the position of either side can be fully sustained.

Coming at once to the fundamental question in the case, we do not think that the contract was abrogated in 1930 and see no ground for determining the value of the current furnished on the basis of implied contract. It is true that the parties had not been able to get together on their interpretation of the contract and that modifications thereof were contemplated; but we do not think that it is correct to say either that they abrogated the contract or that they agreed that the price of current under its provisions should be 9½ mills per k. w. h. until these provisions should be changed or modified. What they did was merely to adopt 9½ mills as the tentative billing rate for which the contract provid-

ed and to agree that, in the event of the modification of the terms of the contract, the rate applicable under such modification should be retroactive. The parties contemplated, as shown by the letters to which we have referred, that modification would take place within the year; and they were providing that, when adjustment was made at the end of the year as provided by the contract, changes in the rate due to modifications, as well as those due to corrections, should relate back to the first of the year.

This, of course, did not abrogate the contract; and we think it equally clear that it did not result in substituting the 9½ mill rate as the rate to be finally applicable under the contract in the absence of further change or modification. In view of the practically universal custom of basing power rates on demand, or maximum load, as well as on energy, or use of current, it is inconceivable that the parties should have intended to adopt a flat rate for current used as the rate to be applicable under the contract in the absence of further change which would require the assent of both parties. It is much more reasonable to assume that, in adopting such flat rate as a tentative billing rate, they had in mind the same sort of tentative billing rate that the contract called for and that they had been using since its inception, i. e., a billing rate upon which monthly payments were to be made, but which was subject to adjustment at the end of the year. This conclusion is borne out by the fact that every bill sent United after January, 1930, bore upon its face the statement that the 9½ rate appearing thereon was tentative. It will not do to say that this meant that the rate was tentative merely in the sense that it was subject to change by agreement made within the year; for the bills sent after the expiration of the year bore the same notations.

Since, therefore, the contract was not abrogated and there has been no agreement modifying it, it follows that the current furnished the United must be paid for in accordance with its terms; but it by no means follows that the only term of the contract to be considered is Article XII. Article XIV containing the "most favored customer" clause is also a part of the contract; and we think it clear that the effect of that article was to limit the rate which the Consolidated might exact of the United to the rate of its "Schedule T," which by its express terms applies to power furnished for industrial or railroad uses. See Standard Oil Co. v. Wright Oil Service Co. (C. C. A. 4th) 26 F.(2d) 895; Spang v. Rainey (C. C. A. 2d) 79 F. 250; 55 C. J. 229. It appears from the record that the Schedule T rate, when applied to service furnished United and its receivers since January 1, 1932, will result in a per k. w. h. rate considerably less than the 9½ mill rate upon which Consolidated insists. United contends that this rate is 8.13 per k. w. h. Consolidated's figures are 8.842. It is argued that the rate of Schedule T is available only to those customers who comply with the conditions upon which it is obtainable, but the only conditions are that the customer have a minimum load of 200 kilowatts and a power factor not below 75 per cent. and that he sign an agreement for permanent power service for five years. The United has a minimum load vastly greater than 200 kilowatts, a power factor practically 100 per cent. and it has signed an agreement for power service for ten times five years. It is clear not only that the United fulfills every requirement that is a prerequisite to service under the T Schedule, but also that the volume of current which it uses, the permanence of the service which it requires, and the load factor which it maintains would entitle it to a more favorable rate than any of the Consolidated's T-rate customers, if the rate were being determined by the court on the basis of rate making, instead of under the provisions of a contract.

We do not think, however, that the United was entitled to the rates which would result in applying to the service furnished it the terms of the Pennsylvania Railroad Company's contract. In the first place, the Pennsylvania has not as yet received or paid for any current under the terms of its contract; and we do not think that a mere executory contract can be relied on as a sale at a lower rate to justify the demand for a lower rate under the "most favored customer" clause. The guarantee of the contract is to give the United "the benefit of the most favorable rate given to any large customer"; and the rate of the contract cannot reasonably be said to have been given to the Pennsylvania in the sense of the guarantee until current is actually delivered at the contract rate. In the second place, the conditions of service under which current is to be supplied to the Pennsylvania are so radically different from those which prevail in the case of the United

that the guarantee, which is conditioned upon substantially similar conditions, cannot in fairness be applied. The Pennsylvania takes the greater part of the current at the Safe Harbor plant of the Consolidated and pays the cost of transporting it to where it is needed. It takes 60 cycle current and bears the cost of converting it to 25 cycle frequency. And, most important of all, its peak demand for current occurs during the hours between midnight and dawn, when the demand of Consolidated's other customers is lowest; and this will enable Consolidated to utilize its equipment at the Safe Harbor plant at a time when the flow of the river would otherwise be going to waste over the dam. While the rate given the Pennsylvania would be a pertinent factor for consideration if we were fixing the rate here on the basis of a reasonable charge, we do not think that there is sufficient similarity in conditions to justify a holding that the rate of the Pennsylvania contract must be given United because of the "most favored customer" provision of Article XIV.

■ And we do not think that any basis is afforded under Article XXI for further reduction of the rate of the contract. It is doubtful whether that article can be resorted to as furnishing any criterion upon which to determine rates. It would seem rather to furnish a guide for action under Article III which we have quoted, or, if violated, grounds upon which United might refuse to proceed further under the contract. But, however this may be, there is no evidence which would justify the reduction of the contract rate under Article XXI. The evidence offered is merely as to the rate charged for current; and this is dependent upon so many different factors in different cities—cost of coal, availability of hydro-generated current, labor cost, competitive conditions, attitude of the people towards different types of service etc.—that it could not possibly furnish any dependable standard by which to measure either Consolidated's cost of producing current or the efficiency or competency of its management. It certainly could not have been intended by the parties that the rate payable under the contract should be gauged by the rates charged by other companies in other cities; and there is no evidence whatever that Consolidated is not using a proper degree of diligence in the operation of its stations or in availing itself of the latest developments in the art of generating current. And we see no basis for reduction of the rate in the evidence as to the cost to United of producing power in a hypothetical independent plant of its own. Such evidence might be pertinent in the event of attempted action under Article III; but it is not reasonable to presume that the parties intended that, after current had been furnished, the rate payable therefor should be determined on any such hypothetical basis. If they did, then there was certainly no reason for the elaborate provision in Article III with respect to terminating the contract in the event the United should be able to demonstrate its ability to produce or purchase its current at a less rate than it was being charged.

■ The contention that the 9½ mill rate was applicable as one established by law is entirely without merit. No such rate has ever been filed with the Public Service Commission, but the contract, which was filed with the Commission, contained the provision guaranteeing to United the benefit of the most favorable rate given any larger user of current. Schedule T was on file with the Commission, and the rate that we hold that United is entitled to under its contract is the rate prescribed by Schedule T. Likewise, there is nothing in the contention that the United was bound as upon an account stated by the receipt without protest of the monthly bills. Each of the bills bore upon its face the statement that the rate therein charged was a tentative rate.

■ Our conclusion, therefore, is that in determining the amount due on the prereceivership claim the rate must be determined under the contract, but that the contract rate is limited by the rate of Schedule T. As to the rate to be applied in the case of current furnished the receivers, we think that the rate of the T Schedule is applicable here also. The implied contract of the receivers was to pay the legal rate for current furnished; and we think that the rate of the T Schedule was the legal rate applicable, whether we look to the original contract filed with the Public Service Commission as establishing the rate for the particular service or whether we look to Schedule T as establishing the rate for service of this character. See Maryland Code, art. 23, §§ 364, 365, 387; Kelly v. Consolidated Gas, Electric Light & Power Co., 153 Md. 523, 138 A. 487.

We do not agree with the court below in holding that the mere payment of the monthly bills precludes inquiry into the rate at which payment has been made. The contract expressly provides for adjustment of the rate paid during any year at the end of that year and settlement on the basis of the amount due when the correct rate is applied. Because of the provisions of Article XV of the contract which we have quoted, there can be no recovery by the United or its receivers on account of excessive rates paid prior to January 1, 1932; but there is no reason why the rate paid during the year 1932 should not be adjusted as the contract provides and claim allowed only for the balance due on account of current furnished during that year. While ordinarily the receivers would be barred by the limitation of the contract which would bar the United from asking for a refund of an overcharge where claim was not filed within twelve months [see Fidelity & Casualty Co. v. Hoyle (C. C. A. 4th) 64 F.(2d) 413], we think that the filing of the claim for current furnished during a portion of a period which was to be considered as an entirety under the contract for the purposes of readjustment brings the rates charged during the entire period before the court for review, as the claimant is equitably entitled only to the balance due for current furnished during the period after the rate is properly adjusted and proper credits are allowed.

As there was no definite finding by the court below as to the rate per k. w. h. applicable under Schedule T to the current furnished to the United for the period from January 1, 1932, to the date of the receivership and to the receivers thereafter, we shall not attempt to determine that matter, but shall remand the case to the end that the judge below may determine it. After determining the rate properly applicable in accordance with this opinion, he will determine the amount of the claim of the Consolidated, by calculating the amount due for current furnished United from January 1, 1932, to the date of the receivership at the proper rate, and by deducting therefrom the amount paid by United on account of such current and the amount which Consolidated should refund on account of the payments made by the receivers. The deduction of the item last mentioned is directed on the assumption that the amount which the receivers have paid for current has been at a greater rate than was prop-erly applicable, and that a proper adjustment of the rate during the period of the receivership will show an overpayment to Consolidated.

The order appealed from will be reversed, and the cause will be remanded for further proceedings in accordance with this opinion.

Reversed and remanded, with directions.