**KAISER ALUMINUM & CHEMICAL CORPORATION**

v.

**UNITED STATES.**

No. 102–54.

United States Court of Claims.

March 1, 1961.

See also 157 F.Supp. 939, 141 Ct.Cl. 38.

Gerhard A. Gesell, Washington, D. C., John W. Douglas, Covington & Burling, Washington, D. C., Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., and Cox, Langford, Stoddard & Cutler, Washington, D. C., on the brief, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Geo. S. Leonard, Acting Asst. Atty. Gen., for defendant.

JONES, Chief Judge.

This is an action for breach of contract. Plaintiff sues to recover approximately four and a half million dollars in damages. The facts of this suit relate back to the Second World War when the defendant erected a number of plants devoted to the manufacture of aluminum, from the raw material through to the finished product. These plants were built and operated for the defendant by the Aluminum Company of America (hereinafter called Alcoa). Prior to the war, however, a proceeding was brought against Alcoa by the defendant seeking relief against monopolistic practices charged against Alcoa. See United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416.

After the war, these plants were declared surplus and ready for disposal pursuant to the Surplus Property Act of 1944, 58 Stat. 765, 50 U.S.C.A.Appendix, § 1611 et seq. To accomplish defendant's objective of creating a competitive situation in the aluminum industry, the defendant sought to sell these plants to companies other than Alcoa. However, the defendant desired to sell these plants only to companies with sufficient financial resources and technical competence to assure their success in the operation of these plants. Accordingly, after canvassing other potential purchasers, the defendant decided to dispose of these plants between the Reynolds Metals Company and the Kaiser Aluminum & Chemical Corporation.[1]

---

1. Until November 28, 1949, the same corporation was named the Permanente Metals Corporation.

In 1945 and 1946, Reynolds Metals Company (hereinafter called Reynolds) leased the following plants: Hurricane Creek Alumina Plant in Hurricane Creek, Arkansas, in which alumina is produced from bauxite ore; the Jones Mills Aluminum Reduction Plant in Jones Mills, Arkansas, and the Troutdale Aluminum Reduction Plant in Troutdale, Oregon, in both of which alumina is reduced to aluminum metal; and the McCook Rolling Mill in McCook, Illinois, in which aluminum is fabricated for industrial use.

In 1946, Kaiser Aluminum & Chemical Corporation (hereinafter called Kaiser) leased the following three plants: the Baton Rouge Alumina Plant in Baton Rouge, Louisiana, in which alumina is produced from bauxite ore; the Mead Reduction Plant in Spokane, Washington, in which alumina is reduced to aluminum metal, and the Trentwood Aluminum Rolling Mill in Spokane, Washington, in which aluminum is fabricated for industrial use.

It should be observed that defendant's initial disposal of these plants to Kaiser and Reynolds was by means of a leasing arrangement. After several years, however, both Kaiser and Reynolds had realized a considerable measure of success in operating these plants. They had succeeded in their apprenticeship; they were now ready to buy. Early in 1948 [2] defendant entered into negotiations with both plaintiff and Reynolds to sell plaintiff the three plants which plaintiff was leasing and to sell to Reynolds the four plants which Reynolds was leasing. The sale of the Kaiser plants was concluded first. After lengthy negotiations, Mr. Henry J. Kaiser and Admiral Paul Mather of the War Assets Administration met at a luncheon conference on July 27, 1949. At that time the parties reached an agreement on the price, $36,000,000, for the three Kaiser plants. At that conference, Admiral Mather signed a letter the contents of which have given rise to this litigation. The letter reads:

"Dear Mr. Kaiser:

"It is understood that the War Assets will not offer the same type of plants to Reynolds Metals or others on a more favorable basis. In the event that circumstances now unforeseen result in a more favorable disposal of such plants Permanente shall receive corresponding treatment and the disposal documents and obligations and rights therein contained for these three plants (Baton Rouge, Mead, and Trentwood) will be modified and adjusted accordingly.

"Very truly yours,
"(s) Paul L. Mather,
*Rear Admiral, U.S.N. (Retired),*
*Liquidator"*

On July 29, 1949, a further letter was sent to Mr. Kaiser which specified the four Reynolds plants as the type of plants to which reference had been made.[3]

After the Kaiser sale, Reynolds reopened its purchase negotiations. Reynolds purchased the four surplus aluminum plants in December 1949 for $50,819,937.72.[4]

The plaintiff asserts that a more favorable contract was made with Reynolds and that as a consequence plaintiff is entitled to compensating damages.

While the letter is couched in general terms, the only practical way to determine whether one purchaser was treated more favorably than the other is to match terms in so far as they are comparable, to analyze the advantages and disadvantages in the two contracts, and upon this analysis to determine whether an adjustment should be made pursuant to the terms of the letter.

The plaintiff has selected five items in which it asserts more favorable term treatment was given Reynolds. It is these items on which plaintiff bases its claim for damages. The five items

2. See finding 21.

3. Finding 57.

4. See finding 83.

around which plaintiff alleges damage claims are fume control, carbon-electrode capacity, acquisition costs, interest, and backdating. We proceed to examine each of these items *seriatim* and inquire as to whether, viewing each item on an over-all basis, Kaiser was discriminated against. If, from this over-all approach, it is shown that the plaintiff has been materially disadvantaged, then to that extent the defendant is in breach.

## A. Fume Control

■ Plaintiff asserts that it was necessary to install a fume control system at its Mead plant in 1951. Plaintiff says that the defendant had contracted to pay 60.61 percent of the cost of a fume control system at the Troutdale plant operated by Reynolds. Kaiser therefore contends that since Reynolds received a fume control system at 39.39 percent of its cost, Kaiser is entitled to recover 60.61 percent of the cost of installing fume controls in the Mead plant in 1951 and 1952.[5]

The circumstances at the time of sale with respect to fume control were very different between the Reynolds Troutdale and the Kaiser Mead plant. The Reynolds sales contract contained the following provision: "Seller agrees to complete the installation of the fume control equipment at the Troutdale Aluminum Reduction Plant in accordance with the terms of the contract * * * of May 25, 1949."[6] There was no outstanding contract to install fume controls at the Kaiser Mead plant.

The fume control problem at Troutdale was of long standing. The Troutdale plant is located in a rich agricultural region in Oregon, studded with nurseries and dairy farms. The fluorine gases generated as a result of the electrolytic process which reduces alumina to aluminum are potentially injurious to animal and plant life. A stopgap fume control system[7] was installed by the defendant at Troutdale, therefore, when Reynolds was still defendant's lessee. However, the stopgap system failed to allay the complaints made against the fumes generated by the Reynolds plant, and the plant on June 7, 1948, was threatened with an injunction against its continued operation, plus damage claims amounting to $1,500,-000 for alleged injuries to cattle and gladioli.[8]

Because of the gravity of the fume control problem at Troutdale, there was an outstanding contract for the installation of fume controls at Troutdale and none for the installation at Mead. Moreover, there were fume damage indemnity provisions in the Reynolds leases and none in the Kaiser lease. Of course the most important distinguishing element is that the fume control problem at Troutdale was, due to location, far more severe than the fume control problem at Mead.[9] Mead, like Reynolds' Jones Mills Plant, was located in a dry timbered region which was not adjacent to a highly developed farming area. One $2,000 claim was all that Kaiser could produce to demonstrate a fume control problem at Mead.[10] In Troutdale, on the other hand, $150,000 of claims arose before 1946, and almost a million dollars have been spent under the indemnity clauses. Other claims are still pending.

We believe the findings of the trial commissioner clearly show that the fume control problem at the Reynolds Troutdale plant was fundamentally different both in extent of outstanding obligations and in degree from the problem at the Kaiser Mead plant. If there had been an earthquake at Troutdale and the defendant had agreed to pay 60.61 percent of the cost of rebuilding the aluminum reduction plant at Troutdale, would the plaintiff then have the right to claim as

---

5. See finding 135 for the cost to Kaiser of fume controls at Mead.

6. Finding 108.

7. Finding 111.

8. Finding 112.

9. Finding 110.

10. Finding 126.

damages 60.61 percent of the cost of the plant building at Mead even though the plaintiff did not build a plant until after the sale and then not because of an earthquake but because of fear of one? Plaintiff's argument places too scholastic an interpretation on the letter of July 27, 1949. We think the claim is unwarranted.

### B. Carbon-Electrode Capacity

This aspect of plaintiff's claim is addressed to amounts expended by the defendant to make a Reynolds plant, Jones Mills, fully operable. Plaintiff compares these amounts with amounts spent by it to make its Mead plant fully operable. The plaintiff asserts that subsequent to the sale it had to make expenditures to deal with a carbon-electrode deficiency at Mead. The plaintiff now wishes to claim these expenditures as damages. In short, the plaintiff says: to make Mead fully operable *we* had to put out money while the money that was needed to make Jones Mills fully operable was put out by the *defendant*. However, here as elsewhere the plaintiff is asking us to compare its beans with the Reynolds' potatoes. The expenditures at Jones Mills were for reconditioning pot lines while those at Mead were for overcoming a carbon-electrode deficiency. Moreover, the trial commissioner's findings show that during the lease period, no requests were made by Kaiser for additional carbon electrodes for its Mead plant under the lease entitling Kaiser to ask for additional carbon electrodes. Indeed, the trial commissioner has found that in the course of the sales negotiations the Kaiser representatives adverted to the elimination of the carbon obligation in the Mead lease as one of the advantages to the defendant of a sale. In fine, we think there is no merit in this claim.[11]

### C. Acquisition Costs

Plaintiff bases this aspect of its claim on the ground that in computing Reynolds' acquisition costs, deductions were taken which had not been taken in computing the Kaiser acquisition costs. The term "acquisition costs" is used here to refer to the original cost to the defendant of constructing and equipping the plants in question. Defendant sold the two sets of plants to plaintiff and to Reynolds at 39.39 percent of their "acquisition costs." The plaintiff concedes, and the trial commissioner has found, that plaintiff and defendant could not agree on the correct acquisition cost figure for the Kaiser plants. Consequently, the final sales price to Kaiser was a negotiated figure.[12] Subsequently, defendant determined that the Kaiser sales price was 39.39 percent of the plants acquisition costs. Defendant therefore resolved to adopt the same procedure in determining the Reynolds sales price.

Although conceding that the same percentage of cost acquisition was used, the plaintiff protests that the two sets of acquisition cost figures were not computed in the same manner. The plaintiff points to deductions from acquisition costs granted to Reynolds for bath material, pot relining, surplus property, and stopgap fume control which were not granted to it. Any discussion of whether these deductions were fair and reasonable to the plaintiff should take into account that Reynolds was forced to purchase excess capacity at Hurricane Creek, a power plant at Jones Mills, and a sinter plant at Hurricane Creek: these were all purchases for which the Kaiser sale presents no parallels.[13] Indeed, the trial commissioner has found that during the course of the negotiations with Reynolds, the Government negotiators were accused of being prejudiced in favor of Kaiser.

We think it might fairly be argued that the deductions granted Reynolds are offset by the fact that Reynolds had to purchase sinter and power plants while Kaiser, because of location and circumstance, was relieved from the necessity of mak-

11. See findings 150 and 151.

12. See finding 60.

13. See finding 73.

ing similar purchases. However, we find this claim is unwarranted on another ground: the plaintiff had no corresponding set of circumstances at its plants which would warrant or even permit the deductions given to Reynolds. Kaiser cites four adjustments made in the calculation of the acquisition costs of the Reynolds plants: bath materials, pot relining, surplus property, and stopgap fume control. For these adjustments, plaintiff seeks damages. We proceed to consider these items.

First, the plaintiff seeks damages for the defendant's treatment of bath materials with regard to Reynolds. In the aluminum reduction process, the electrolyte in the pot consists entirely of cryolite. The cryolite and its additives are called bath materials. The bath is gradually consumed in the production of aluminum. In the computation of Reynolds' acquisition costs, the estimated costs of bath absorption at Jones Mills were deducted from the capitalized cost for each plant. This was done to adjust the original cost of the facilities leased. No similar deduction is itemized in the adjusted costs for the Mead plant stated in the war assets valuation report on the Kaiser plants. We conclude from the evidence that, in regard to the bath materials, because of the different circumstances of each sale the parties were differently but fairly treated. When Kaiser began operations at Mead, it was *given* by the defendant $274,000 worth of bath materials then present at the plant. During the lease period, Kaiser received $120,000 worth of bath materials from War Assets. The record does not show that Reynolds received any free materials. We do not think that the deduction of the bath absorption at Jones Mills and Troutdale from the capitalized cost for each plant in the computation of Reynolds' acquisition costs resulted in any unfairness to Kaiser.

Second, plaintiff has entered a claim for pot relining. Kaiser claims that it is entitled to have its costs reduced by the amount subtracted from the Reynolds'

costs for the expense of removing the old pot relinings. This deduction arose out of the belated rehabilitation of the Reynolds' Jones Mills plant.

Third, plaintiff claims that deduction of the cost of surplus material which had been transferred from the Reynolds plant or used in their rehabilitation was improper because no deduction for surplus material was made in the computation of Kaiser costs.

Fourth, plaintiff contends that the cost of the stopgap fume control system installed at Troutdale in 1946 was deducted from the Reynolds' costs. We think the plaintiff's damage claim on the basis of the deduction given Reynolds for the stopgap fume control system is a good example of the complete absence of circumstances on the plaintiff's side which could permit the allowance of a similar deduction to Kaiser. There simply was no stopgap fume control system at *any* Kaiser plant. Since Kaiser had no comparable property, how in reason could the defendant be expected to make a comparable deduction? There was no stopgap fume control system at a Kaiser plant because there was no fume control problem at any of Kaiser's plants comparable to the one that existed at Reynolds' Troutdale plant.

We conclude that the claims for differences in treatment of pot relining, surplus property, and stopgap fume control are all susceptible to the same fatal objection. The evidence does not show that the conditions at the Reynolds plants which led to the award of these deductions to Reynolds were present in the Kaiser plants. What is decisive in this case is not whether as to certain particulars these two purchasers were treated differently but whether viewing these particulars together Kaiser was treated unfairly in comparison with Reynolds. The claims based on pot relining, surplus property, and stopgap fume control all hinge on the same issue: were there similar factors operating in the Kaiser plants that would permit deductions to Kaiser similar to those extended to Reyn-

olds? With regard to the items discussed above, the evidence is clear that the answer is in the negative.

## D. Interest

Kaiser claims that interest was computed in both the Kaiser and Reynolds sales as though the rent paid subsequent to July 1, 1949, had been paid on that date. Kaiser claims that, as a result, savings of $9,820.58 were realized by Reynolds which were not available to Kaiser. Since Reynolds on its four-plant purchase paid more rent than Kaiser on its three-plant purchase, Reynolds realized more in the way of savings as a result of treating rent paid after July 1, 1949, as if it had been paid on July 1. Basically this claim is dependent on whether there was any unfairness in the selection of July 1, 1949, as the effective date of sale for both sales. Since the plaintiff has asserted other claims for damages which it alleges were also incurred as a result of the selection of the July 1 date, we shall proceed to inquire whether on an over-all basis the selection of the July 1 date was discriminatory or unfair to plaintiff.

## E. Backdating

■ The sale to Kaiser was concluded on July 27, 1949. The Reynolds' sale occurred on December 21, 1949. Both sales were made effective on July 1, 1949, and both purchasers stopped paying rent and began the payment of interest as of that date. The result of the selection of July 1, 1949, as the date of effective sale was to grant Reynolds 174 days of rental forgiveness and Kaiser only 27 days of rental forgiveness. Although it is our view that on an over-all basis the Reynolds "deal" was nearly equivalent to the Kaiser "deal," we believe that in regard to backdating, the treatment of these two companies was unfairly dissimilar.

14. See finding 103. The plaintiff has suggested two damage theories on this point. We think fairness requires that the damage figure, against which interest is to be offset, should be the difference be-

The defendant says that the selection of the same date as the effective date of sale for both purchases merely illustrates the general policy of equal treatment which it observed in dealing with these two companies. We think this reasoning does homage to equality in form but not in substance. As the plaintiff says, such a theory would permit the defendant any amount of backdating. Presumably if Reynolds had decided to buy the plants in December 1959 rather than in December 1949 it still would have been permissible to have the sale treated as effective on July 1, 1949.

Kaiser claims the difference between the Reynolds' rent canceled,[14] $1,921,631.-01, and the Kaiser's rent canceled, $249,-345.71. This yields a figure of $1,672,-285.30. Such an amount, however, cannot possibly represent the fair measure of the Reynolds' advantage over Kaiser because it does not offset against the amount of rental forgiveness the amount that had to be paid on interest. The establishment of July 1, 1949, as the effective date of sale resulted in granting *benefit* and *detriment*—in unequal portions —to the two companies involved. On the credit side of the company ledger, rental obligations accruing after the effective date of sale were forgiven. On the debit side of the ledger, however, from July 1, 1949 forward, the companies were required to pay interest. Reynolds had to pay interest on its purchase price for the 174-day period from July 1 to December 21, computed at 4 percent, a sum of $954,-986.82. Kaiser had to pay interest on its purchase price for the 27-day period from July 1 to July 27, computed at 4 percent, a sum of $106,520.55.

To arrive at the actual measure of the Reynolds' advantage over Kaiser we have utilized the following formula: we have subtracted the rent forgiven *Kaiser* minus the interest expended by Kaiser from the rent forgiven Reynolds *minus*

tween the Reynolds' rent canceled and the Kaiser's rent canceled, or $1,672,-285.30.

the interest expended by Reynolds. The following table indicates the measure of advantage realized by Reynolds over Kaiser:[15]

### Reynolds

| | |
|---|---|
| Rent forgiven | $1,921,631.01 |
| Interest paid | 954,986.82 |
| | 966,644.19 |

### Kaiser

| | |
|---|---|
| Rent forgiven | 249,345.71 |
| Interest paid | 106,520.55 |
| | 142,825.16 |

### Over-all comparison

| | |
|---|---|
| Reynolds: Rent forgiven minus interest | $966,644.19 |
| Kaiser: Rent forgiven minus interest | 142,825.16 |
| Difference | 823,819.03 |

———◆———

However, the exact difference between the rent forgiven Reynolds minus interest compared with the rent forgiven Kaiser minus interest cannot be the measure of Kaiser's damages. It must be borne in mind that on its sale Kaiser paid $36,000,000. Reynolds, on the other hand, paid $50,819,937.72. We think that if the Reynolds and Kaiser companies are to be given equal treatment with regard to backdating, it must be on the basis of a ratio of the Kaiser purchase price to the Reynolds purchase price which we find to be about 70 percent. It should also be remembered that Reynolds received a saving of almost ten thousand dollars because all rent paid by the parties *after* July 1, 1949, was treated as if it had been paid *on* July 1.[16] Taking all these facts and circumstances into account, we find the amount of $583,549.00 is adequate to equalize matters between these two companies in regard to backdating. We believe this amount will put Kaiser on the same basis with Reynolds with regard to the main advantage obtained by backdating, rent forgiven, and with regard to the main disadvantage resulting from backdating, the running and payment of interest.

During the course of this opinion we have assayed the plaintiff's various damage claims. We believe that a comparison of the Reynolds and Kaiser transactions reveal that, on the whole, the agreement set forth in the letter of July 27, 1949, was honored by the defendant with a single and substantial exception. As to that exception (the plaintiff's claim for damages resulting from backdating the sale in both transactions to the same date), we think the evidence discloses a breach of the agreement of July 27. Therefore, we think as to that claim, the plaintiff is entitled to damages.

Judgment will be entered for the plaintiff in the sum of $583,549.00.

It is so ordered.

DURFEE, LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.

15. See findings 98, 99, 100, and 101.

16. See page 895 of this opinion.