**REYNOLDS METALS COMPANY**

v.

**The UNITED STATES.**

**No. 321–68.**

United States Court of Claims.

Feb. 19, 1971.

Collins, J., dissented and filed opinion.

James L. Kaler, Washington, D. C., attorney of record, for plaintiff.  Fred R. Edney, Asst. Gen. Counsel, Reynolds Metals Co., Richmond, Va., Chisman Hanes and Kaler, Worsley, Daniel & Hollman, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

Reynolds Metals invokes for this claim the blue-blooded parentage of Kaiser Aluminum & Chemical Corp. v. United States, 388 F.2d 317, 181 Ct.Cl. 902 (1967), 409 F.2d 238, 187 Ct.Cl. 443 (1969), but the child turns out to be a changeling rather than a true heir. The facts are the same (we can assume) but Reynolds, unlike Kaiser, waited beyond the magic period of six years.

During the Korean emergency the Government undertook to secure expansion of primary aluminum manufacturing facilities in order to increase the supply of that commodity to meet the demands generated by the war effort. The General Services Administration (GSA) entered into contracts with leading aluminum producers, including Reynolds, which agreed to finance, construct and operate reduction plants and to produce certain quantities of the metal. In return, GSA agreed to purchase all of the production in such additional facilities, up to specified quantity limits, that the companies were unable to sell or otherwise utilize. The Reynolds contracts were made in 1950 and 1951 and provided for the manufacture of a total of 1,600,000,000 pounds of primary aluminum. These agreements were substantially similar to contracts executed at the same time between GSA and Kaiser as well as the Aluminum Corporation of America (Alcoa).

As part of these agreements, the Administrator of the General Services Administration granted each contractor the right to incorporate into its agreement any contract terms negotiated by GSA with the other producers, if the particular contractor believed that such terms were more favorable than those contained in its own contract. This commitment is known to this litigation as the "most favored nation" or "most favored seller" agreement.[1]

The contracts between GSA and Kaiser have twice come before this court. The ultimate issue was whether the quantity limit of the "put" granted Kaiser had been reached, that is, whether the GSA had purchased all of the additional production of aluminum it was required to under the contract. The reso-

[1]. Reynolds' most favored nation agreement was contained in the following letter:

"GENERAL SERVICES ADMINISTRATION
WASHINGTON
OFFICE OF THE ADMINISTRATOR
November 24, 1950

Mr. Richard S. Reynolds, Jr.
President, Reynolds Metals Co.
Richmond, Virginia
Dear Richard:

This is to confirm my telephone conversation with you of this morning. You will recall that I officially committed this Administration to amend any agreement we might reach on the expanded capacity of your company if later agreements with the Aluminum Company of America and/or the Kaiser Aluminum and Chemical Company are, in your opinion, more favorable than the agreement which has been executed with you.

Such amendments will be for the purpose of bringing your contract into conformity with agreements of the aforesaid companies.

Sincerely yours,

(Signed) JESS LARSON
Jess Larson
Administrator"

This agreement was reaffirmed by letters dated August 25, 1951 and May 6, 1954 from the General Services Administration to Reynolds.

lution of that issue in turn depended on the propriety of GSA's requirement that Kaiser include its production of offgrade metal (aluminum of less than 99% purity) in the computation of its total contract production. In *Kaiser I, supra,* 388 F.2d 317, 181 Ct.Cl. 902 (1967), the court, under the belief (fostered by the defendant) that Reynolds had been permitted by the GSA to exclude its offgrade production, held that the Government had breached its most favored nation commitment by denying Kaiser the same treatment.

After our *Kaiser I* decision Reynolds demanded an additional sum from the Administrator of GSA as due under its contracts, alleging that both Reynolds and Kaiser had included offgrade metal in their production computations. Reynolds told the GSA that the award of judgment to Kaiser based on a recomputation of production which excluded offgrade constituted a preference of Kaiser over Reynolds in violation of the favored nation clause.

The defendant then moved the court for relief from the *Kaiser I* judgment, belatedly questioning the existence of the disparity of treatment which it had previously conceded and which was the foundation of our ruling. In *Kaiser II, supra,* the court's opinion on that motion, we chose to abandon the most favored nation principle as *ratio decidendi,* and instead held that the substantive terms of the Kaiser contract mandated the exclusion of offgrade production.[2] That theory had been urged as an alternative ground for recovery in *Kaiser I,* but had not been reached by the court.

Meanwhile, in October 1968, after GSA had refused its demand for payment, Reynolds brought this suit, claiming that the Government had breached its duty of equal treatment under the most favored nation clause. The defendant now moves for summary judgment, asserting that any action Reynolds may have under its contracts is barred by limitations.

Our familar limitations statute, section 2501 of Title 28 of the U.S.Code, provides that every claim of which the Court of Claims has jurisdiction shall be barred unless a petition is filed within six years after the claim first accrues. Thus, Reynolds' cause of action cannot have accrued prior to October 1962. The contracts with which we are concerned were made in 1950 and 1951. In September 1957 the parties agreed on a method of computation of primary aluminum production for the period beginning April 1, 1957. This suit relates solely to production prior to that date.

If there were no most-favored-nation coloration to the case, there would be, as the defendant points out, several possible times of accrual of the claim—all more than six years past. First, since the material terms of Reynolds' contracts are conceded to be substantially the same as in *Kaiser,* we can assume that those terms required the exclusion of offgrade production from contract computation. The insistence of GSA that Reynolds include such metal would therefore constitute a contract breach at some point prior to April 1, 1957 (after which a new formula came into effect, see *supra*), for which an immediate action could lie. *Cf.* Henry Products Co. v. United States, 180 Ct.Cl. 928 (1967). Another possible time is the expiration dates for the production periods involved, the latest of which was November 1959. All of the acts necessary to create defendant's liability had occurred by then, and plaintiff could have assessed its quantum of damages at that time. See Terteling and Sons v. United States, 334 F.2d 250, 254–255, 167 Ct.Cl. 331, 337–338 (1964). At the very latest, Reynolds' cause of action for substantive breach ripened at the time of final payment under the contracts. Nager Electric Co. v. United States, 368 F.2d 847, 851–852 nn. 4 & 5, 177 Ct.Cl. 234, 240 nn.

---

2. Kaiser Aluminum & Chemical Corp. v. United States, *supra,* 409 F.2d 238, 240–

241, 242, 187 Ct.Cl. 443, 448, 450–451 (1969).

4 & 5 (1966); Acorn Decorating Corp. v. United States, 174 F.Supp. 949, 951–952, 146 Ct.Cl. 394, 398 (1959). These last payments were made in January and February 1961. The result is that this action is time-barred if we compute the six years from any traditional point of accrual for contractual actions against the Government.[3]

Reynolds contends, however, that all of this learning is off-target because the contracts contain a most favored nation clause, and this suit is for a breach of that obligation which occurred only when the defendant paid Kaiser more than seven million dollars in damages in 1968 as directed by our judgment in *Kaiser I.* It is said that the cause of action founded on that obligation exists independently of any substantive cause of action under the contract, and that the petition was therefore filed within six years of the claim's accrual.

■ We can agree, of course, that a party to a contract may breach a duty of equal treatment without simultaneously violating any of its other obligations, see Kaiser Aluminum & Chemical Corp. v. United States, 287 F.2d 890, 152 Ct. Cl. 641 (1961) (a case involving Kaiser's purchase of surplus aluminum plants) and *Kaiser I, supra,* and also assume in that situation that the protected party's cause of action accrues when a third party receives the more favorable treatment. See Aerovias Interamericanas De Panama, S. A. v. Board of County Commissioners, 197 F.Supp. 230 (S.D.Fla. 1961), rev'd on other grounds, 307 F.2d 802 (C.A.5, 1962), cert. denied, 371 U.S. 961, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963). But these propositions do not help plaintiff because, taking all its factual allegations as true, it fails to assert any real violation of the defendant's obligation to treat it as favorably as the other sellers. Despite plaintiff's argument,

the only acceptable basis of this action is the breach of the substantive provisions of the contracts—the same clauses on which Kaiser ultimately recovered for breach of its agreement. The claim would be precisely the same if the most favored nation article had been omitted from Reynolds' contract, and that clause, rightly read, cannot serve to revive it or to sustain any independent demand. The equal treatment clause, to which plaintiff tries to pin its whole case, is simply irrelevant to the only valid cause of action which plaintiff can and does put forward—a claim for breach of the substantive "put" provisions of its contracts.

In the most favored nation portion of the agreements, GSA did not guarantee that Reynolds would wind up in the same position, economically, as Kaiser or any other seller. The agency undertook a narrower obligation in its November 24, 1950 letter; it committed "this administration" (referring to GSA) to amend any agreement reached with Reynolds if later compacts with other sellers were, in Reynolds' judgment, more favorable than its own contract.[4] As construed in *Kaiser I,* this promise entitled Reynolds to the same terms, if it wished, as those granted the other producers, and to uniform interpretation of those terms by GSA, 388 F.2d at 330, 331, 181 Ct.Cl. at 926. Admittedly, there has been no breach of those two requirements. Reynolds' contracts contained the same provision with respect to computation of production as did Kaiser's. Also, according to the petition, GSA interpreted those provisions for Reynolds in the same way as it did for Kaiser. In both instances offgrade metal was included by GSA in the computation; administratively, both producers were treated alike. The benefit Kaiser received came, not from unequal treatment by GSA, but from a new, judicial con-

---

3. We do not have to decide which method would be the correct one.

4. See note 1, *supra.* The two subsequent confirmatory letters also expressed Rey-

nolds' right, at its option, to have GSA amend the contract to include terms contained in the Alcoa and Kaiser contracts. *Id.*

struction of the contract by this court as a result of a suit begun and sustained by that contractor.

■ In those circumstances, there is little reason to extend the coverage of the most favored nation clause, beyond its wording, to include this type of court-created advantage. Kaiser prevailed because it had the right under its agreement to exclude offgrade production from its computation, and the GSA breached the contract by refusing to recognize that right. Significantly, Kaiser sought to enforce its right within six years of the accrual of the claim. We are assuming that Reynolds had a similar right, as it claims in its petition, since it had the same substantive clauses and the GSA treated it in the same manner. Like Kaiser, Reynolds could have brought suit within six years on the same breach claim, but it failed to do so although it knew about the Kaiser litigation. We can see no basis in logic or policy why Kaiser's recovery should generate a new cause of action for Reynolds under the most favored nation clause. That would allow a party with such a clause to wait comfortably in the shade while another does battle for his rights, and if the more industrious seller should prevail, his counterpart could leave his cool retreat to share in the bounty. This type of equal-treatment agreement is used in a variety of commercial contexts [5] to insure that a protected party will get the benefit of more advantageous terms negotiated subsequently by a competitor, but it should not relieve a party of the duty to vindicate his own rights in timely fashion where, as here, he can do so just as easily as his rival. A most favored nation clause is neither an unnecessary extension of the limitations period nor a refuge for the indolent or the free-rider.[6]

Moreover, it would put too much of a strain on the language of the clause to say that, in these circumstances, it secures to Reynolds any advantage Kaiser happens to receive from any arm of the Federal Government. The clause (*supra*, note 1), as we have pointed out, is framed solely as an obligation of the GSA itself. Even if the words can be read as binding other executive agencies, it is hard to stretch them further to blanket the courts and Congress as well. Yet the acts which Reynolds urges as triggering the clause had their source in those two independent branches. This court decided in Kaiser's favor over the opposition of the Department of Justice. Payment of the court's judgment was made by the General Accounting Office after a specific Congressional appropriation.[7] Thus, the governmental liability was judicially created, the funds to satisfy it were granted by Congress, and payment itself was made by the Controller-General.

■■ It will not do to try to hurdle this obstacle by indulging the fiction that, for favored-nation purposes, the United States Government is like a single party moving with a single will.

---

5. For example, in patent license agreements, see *e. g.*, Cold Metal Process Co. v. McLouth Steel Corp., 170 F.2d 369 (C.A. 6, 1948); St. Joseph Iron Works v. Farmers Manufacturing Co., 106 F.2d 294 (C.A. 4, 1939); in contracts for the supply of electric power, Consolidated Gas Electric Light & Power Co. v. United Railways & Electric Co., 76 F.2d 535 (C. A. 4, 1935); California Electric Power Co. v. United States, 60 F.Supp. 344, 104 Ct.Cl. 289 (1945); and in gas purchase contracts (prior to regulation by the FPC of sales of natural gas by producers); Pan American Petroleum Corp. v. FPC, 287 F.2d 469 (C.A. 10, 1961); Warren Petroleum Corp. v. FPC, 282 F.2d 312 (C.A. 10, 1960).

6. The case would come to us on a different footing if our *Kaiser I* decision stood alone, that is, if Kaiser's recovery had come to rest solely on the ground of GSA's breach of its most favored nation agreement. We intimate no view on whether Reynolds' action brought in October 1968 would be timely in those circumstances.

7. 28 U.S.C. §§ 2517(a), 2518 (1964). A specific authorization would not have been required if the judgment had been for $100,000 or less. 31 U.S.C. § 724a (Supp. V 1970).

The clause is not phrased that way, and there is a long tradition separating the contractual and sovereign capacities of the Government. Its contractual duties are excused if their performance is made impossible by its sovereign acts. Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925); see also, Wunderlich Contracting Co. v. United States, 351 F.2d 956, 966–967, 173 Ct.Cl. 180, 195–196 (1965); Air Terminal Services, Inc. v. United States, 330 F.2d 974, 979–980, 165 Ct.Cl. 525, 534–536, cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964); Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 471–473, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). In *Horowitz* the New York Ordinance Salvage Board had promised to ship silk purchased by the claimant promptly by freight, but was held to be excused from that duty because of an embargo placed on silk shipments by freight by the United States Railroad Administration. Here, we have a kind of converse of the *Horowitz* situation: the United States is not seeking excuse for its non-performance of contractual duties because of its sovereign acts; instead, the contractor is claiming that the sovereign acts of the United States—in providing judicial relief against itself, appropriating money to pay its liability, and paying the judgment—themselves breached the contractual obligation under the equal-treatment clause. As in *Horowitz*, it is fitting to refuse to read that provision so broadly as to intermingle these separate functions of government.

■ Our conclusions are, therefore, that plaintiff Reynolds is necessarily suing upon a claim for breach of contract which is barred by limitations, and that the most favored nation clause of Reynolds' contract does not give it a new or independent claim simply because Kaiser (which did not wait for the time-bar to fall) sought and obtained a judgment in this court. If Reynolds insists that the favored-nation provision must nevertheless be taken as the foundation for its suit, then it has failed to state a claim upon which relief can be granted.

The defendant's motion for summary judgment is granted and the petition is dismissed.

COLLINS, Judge (dissenting):

It seems to me that the crux of the court's opinion is that Reynolds' most favored nation agreement with the Government was not breached by the more favorable treatment accorded Kaiser because Kaiser's more favorable treatment was brought about by a decision of this court and not by the independent action of the GSA. This narrow construction of such an extraordinary agreement appears to me to be inconsistent with this court's opinion in *Kaiser I* [1] as well as with the spirit of the agreement itself.

In *Kaiser I*, this court held that the most favored nation agreement between the Government and Kaiser guaranteed equality of interpretation of contract terms. Without this guarantee, the court reasoned, "reliance upon the right [to uniform terminology] would be an empty exercise." 388 F.2d at 331, 181 Ct.Cl. at 926. By the same token, since matters of contract interpretation, at times, may not be finally resolved without litigation, a guarantee of equality of interpretation is seriously eroded when it is confined to interpretation emanating from the GSA.

Fully stated, *Kaiser I* stands for the proposition that the most favored nation agreement here under consideration guaranteed to the contractors "equality of treatment." Moreover, this proposition, in my opinion, accurately reflects the spirit of the agreement. Before the various aluminum producers involved in the Government's Korean emergency program entered into their separate supply contracts, they demanded assurance

---

1. Kaiser Alum. & Chem. Corp. v. United States, 388 F.2d 317, 181 Ct.Cl. 902 (1967).

that none would get more favored treatment than another. Each producer wanted a guarantee that its competitive position in the aluminum market would not suffer through more favorable treatment being extended to one or more of its competitors under the contracts. This reasonable expectation was accommodated, presumably, by the most favored nation agreement.

Properly interpreted, the agreement guaranteed equality of treatment under the contract. This meant that any time one of the contractors received a benefit under its contract owing to an interpretation of the contract, regardless of the origin of the benefit, which was not extended to another contractor, the latter's most favored nation agreement was breached.

I regard as specious the court's reasoning that Reynolds' most favored nation agreement was somehow inoperative because the funds used to pay the *Kaiser I* judgment were specially appropriated by Congress and actually paid by the General Accounting Office, an arm of the Congress. If the Kaiser dispute had been settled without litigation, the amount of the settlement would have then been paid by the GSA out of GSA funds. I can see no reason for negating the force of Reynolds' most favored nation agreement merely because Kaiser's dispute over contract interpretation was not settled prior to litigation.

While Reynolds' claim for breach of the substantive terms of its contract unquestionably accrued more than 6 years prior to the filing of this suit, Reynolds' present claim is not predicated on a breach of those substantive terms, but on a breach of the Government's obligation of equal treatment. This breach could not possibly have occurred prior to the 1967 decision in *Kaiser I*, well within the 6-year period preceding the filing of this suit. Reynolds' claim for breach of its most favored nation agreement, therefore, accrued within 6 years of the filing of this suit.

I would deny defendant's motion.