**KAISER ALUMINUM & CHEMICAL CORPORATION**

v.

**The UNITED STATES.**

**No. 49–63.**

United States Court of Claims.

April 11, 1969.

Max Thelen, Jr., San Francisco, Cal., attorney of record, for plaintiff. Robert Gordon Sproul, Jr., and Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON DEFENDANT'S MOTIONS UNDER RULE 69(b) (1) AND (2) FOR RELIEF FROM JUDGMENT AND FOR STAY OF PROCEEDINGS

NICHOLS, Judge.

This case is before us on defendant's motion under Rule 69(b) (1) and (2) for relief from our judgment in Kaiser Aluminum & Chem. Corp. v. United States, 388 F.2d 317, 181 Ct.Cl. 902 (1967), and defendant's motion for a stay of proceedings on the Rule 69(b) motion until a decision has been rendered in another case pending before us. Plaintiff, Kaiser Aluminum & Chemical Corp. (hereinafter Kaiser), opposes both motions. A brief review of this earlier *Kaiser* case (hereinafter *Kaiser I*) is necessary for an understanding of the present controversy.

As part of the aluminum expansion program during the Korean War, the General Services Administration (hereinafter GSA) executed contracts on behalf of the defendant with three major aluminum suppliers: Kaiser, the Reynolds Metals Company (hereinafter Reynolds), and the Aluminum Company of America (hereinafter Alcoa). The contracts with each of the companies required expansion of their aluminum production facilities in return for defendant's market guarantee agreements. Under its contracts, Kaiser was to construct additional facilities, privately fi-

nanced, and operate them. In return defendant guaranteed to purchase the production of the additional facilities required by the contracts to the extent that Kaiser was unable to sell this production or use it for its own purposes. Kaiser's contracts obligated it to produce 2 billion 282 million pounds of primary aluminum pig. The ultimate issue in *Kaiser I* was whether or not that amount of production had been achieved. If it had, the Government was relieved of its guarantee liability. If not, Kaiser could produce the remainder and "put" it to the Government, as defined below. The dispute centered around the accounting method used in measuring production under these contracts prior to April 1, 1957. The method of measuring production after that date was not in dispute, having been settled by amendments to the contracts and specifically it was decided by such amendments what treatment should be accorded offgrade aluminum (an unintended product of an aluminum reduction line, most often in the startup phase of operations, which, according to accepted commercial practices when the contracts were negotiated, was defined as aluminum pig having a purity of less than 99%) and alloys (a product which results from the deliberate addition of other metals in the reduction pots). We held, however, that the amendments left open the measurement of production before April 1, 1957.

Kaiser claimed two grounds for recovery in that suit: first, that defendant had breached its original contracts with Kaiser and second, that defendant had breached its later so-called "most favored nation" agreement with Kaiser. Article I of the contracts provided (the contracts were identical in their relevant terms and the following provision is taken from the contract to construct facilities at Chalmette, Louisiana referred to in *Kaiser I* as Chalmette I):

> Subject to the terms and conditions hereof, Contractor agrees to produce and to sell Five Hundred Thousand (500,000) short tons of 2,000 pounds

each, of primary aluminum pig, said primary aluminum to be of minimum grade of ninety-nine percent (99%) aluminum, which primary aluminum is herein called the "additional production." The Contractor will produce such aluminum from facilities which the contractor agrees hereafter to construct, herein called the "additional facilities." * * *

Kaiser interpreted this provision to mean that only metal which had a minimum purity of 99% aluminum or higher would be included in computing "additional production" (thus excluding offgrade) and also that the weight of minimum purity metal should be determined without reference to any other metal added to make alloys. (In *Kaiser I* we referred to this basis of measuring contract production as the "net basis".) The parties had stipulated that the weight of all offgrade and alloy additions before April 1, 1957 was 84,-407,143 pounds, thus, if plaintiff's interpretation of the contract were correct, then Kaiser would have been able to "put" (a forced sale of aluminum to the Government due to a contractor's inability to dispose of the offered aluminum through the usual channels. See Finding 15, *Kaiser, supra,* 388 F.2d 317, 181 Ct.Cl. at 944.) An additional 84,407,143 pounds to the Government, as the amount of contract production would have been reduced by that amount.

Defendant argued that the weight of all aluminum produced at the additional facilities prior to April 1, 1957, regardless of purity and including alloys, should be used to measure the amount of "additional production." (This basis of measurement was referred to as the "gross basis" in *Kaiser I.*) If this interpretation were correct, then Kaiser would have had no claim for recovery.

Kaiser also relied on a most favored nation theory to support its claim. In negotiating the contracts the defendant had agreed that each of the aluminum companies would receive uniform treatment. Letters from defendant to each of the suppliers confirmed this policy.

The agreement allowed Kaiser to compel amendment of its contract terms to conform with the terms of its competitors' contracts. Kaiser had never requested amendment of its contract pursuant to the agreement, but it did contend that its contract should be accorded the same interpretation as those of its competitors. Kaiser argued that Reynolds had been allowed to exclude alloys and offgrade and therefore, under the terms of the agreement, it should be allowed to compute its production for contract purposes in the same way. Kaiser regarded defendant's refusal to permit it to compute its contract production on a net basis as a breach of the most favored nation agreement. Defendant for reasons needless to go into, in view of other conclusions we reach, decided not to contest Kaiser's assertions about Reynolds' accounting methods. Reynolds was not a party and its officials were not called as witnesses. The court took what was said about Reynolds as true, and so found. (Finding 42.) We decided that Kaiser's most favored nation agreement gave it a right to compel a uniform interpretation of its contract and that since Reynolds (as we supposed) had been allowed to exclude alloys and offgrade in computing its contract production Kaiser was entitled to do the same. On December 15, 1967, we entered judgment for Kaiser in the amount of $7,198,655.55.

After our *Kaiser I* decision, Reynolds filed a claim for damages of $7,643,436 with the GSA. Reynolds claimed that it had not excluded all of its offgrade metal in computing contract production, but only some of it, and therefore under its most favored nation agreement with the defendant, it was entitled to the same interpretation of its contract that Kaiser received in *Kaiser I*, *i. e.*, it claimed the right to exclude all offgrade in computing contract production. GSA denied the claim and defendant then brought a suit in the United States District Court for the District of Columbia for a declaratory judgment stating that the United States was not liable to Reynolds

notwithstanding our *Kaiser I* decision. While defendant's declaratory judgment suit was pending, Reynolds filed suit in this court, and defendant then dismissed its suit in the district court. Defendant then filed a motion for relief from the *Kaiser I*, judgment and a motion to stay the proceedings on that motion until the pending Reynolds' suit was disposed of. Defendant maintains that our *Kaiser I* decision, as far as it relied on Reynolds' exclusion of offgrade, is erroneous, but until Reynolds' case is decided, the error cannot be determined. Kaiser opposes both motions. The treatment of alloys is not at issue in the present suit—only the treatment of offgrade. For reasons to be discussed *infra*, neither of defendant's motions can be granted.

Defendant argues that *Kaiser I* was decided on the most favored nation theory and our finding that Reynolds excluded offgrade was the basis for our decision in Kaiser's favor; therefore if Reynolds did not exclude offgrade in computing its contract production, *Kaiser I* is erroneous. Plaintiff, on the other hand, argues that its right to recovery in *Kaiser I* was based on both its interpretation of the basic contract and its most favored nation theory and that even if Reynolds did not exclude offgrade in measuring contract production, so that the most favored nation theory is not determinative as to offgrade, our decision must stand on the original contract ground. Neither party is entirely correct.

Our decision in *Kaiser I* was indeed based on the most favored nation theory, *see* Finding 60, *Kaiser, supra*, 388 F.2d 317, 181 Ct.Cl. at 968, but in deciding the case on that ground, we did not reject Kaiser's contract theory as a basis for its recovery. We did discuss the contract issue at length, but as the case was presented to us, the most favored nation ground seemed to provide a clear and sufficient basis for Kaiser's recovery on both the alloy and offgrade issues, and resolution of the contract ambiguities was made unnecessary thereby. But defendant now wishes to challenge our reli-

ance on Reynolds' treatment of offgrade as a basis for Kaiser's recovery and it does appear there is at least uncertainty as to how Reynolds dealt with its offgrade in computing "additional production." In making this statement we are not prejudging Reynolds' case which is pending before us, and any proof of how Reynolds treated its offgrade will have to await further proceedings in that case.

We did not need to know how Reynolds dealt with its offgrade in order to decide the offgrade issue in *Kaiser I* in Kaiser's favor. Our decision could have rested on an interpretation of the original contract. Article I of the contract appears on its face to be quite clear. The construction difficulties arose because each of the aluminum companies computed its contract production differently and negotiations between the GSA and the aluminum companies were conducted for several years after execution of the contracts for the purpose of defining the term "additional production." The development of a uniform accounting system for measuring contract production by the suppliers was a major topic of discussion at the negotiations and the problem centered around whether or not alloys should be included in measuring "additional production." *Kaiser, supra,* 388 F.2d 317, 181 Ct.Cl. at 921. Kaiser always regarded reporting production as a subject distinct from computing production under the contract, as is apparent from its proposals put forth during its negotiations. It always reported its production on a gross basis, but the method of computing production for contract purposes was left to negotiation. Kaiser is entitled to have its contract interpreted as it reads without suffering from the inconsistent actions of other contractors under other contracts even if their language is the same.

Our interpretation of Kaiser's rights under Article I depends in large part on its actions. We held in *Kaiser I*, 388 F. 2d at p. 328, 181 Ct.Cl. at p. 921, that:

* * * At no point during the years in which the questions of defining the term "additional production" was under discussion, did Kaiser ever advance the proposition that computed production (as distinguished from reported production) should also include offgrade metal. * * *

Thus, Kaiser never desired to have offgrade included in its computations of additional production.

In *Kaiser I* we concluded that Article I of the contract was ambiguous but that there appeared (388 F.2d p. 328, 181 Ct.Cl. p. 922):

* * * to be no basis for resisting Kaiser's clear right to exclude from "contract" production the weight of the offgrade metal that was included in its production reports, since this was never embraced within the scope of the Article I ambiguity. The contracts called for the production of primary aluminum pig and ingot having a minimum purity of 99 percent. * * *

We reached these conclusions about how offgrade should be treated under Article I *not* because we thought Reynolds interpreted its contract so as to exclude offgrade but because of the plain meaning of the language, with which Kaiser's actions were always consistent. According to commercial standards applicable during the contract period aluminum of less than 99 percent purity was considered offgrade. *See* Finding 9, *Kaiser, supra,* 388 F.2d 317, 181 Ct.Cl. at 941–942, and Finding 17, *id.,* 388 F.2d 317, 181 Ct.Cl. at 946, 947. Therefore, by definition, offgrade would be excluded from computation under the contract as Article I called for production of "primary aluminum to be of minimum grade of ninety-nine percent (99%) aluminum."

The question which we thought to be still unanswered by Article I and the evidence before us was what treatment should be accorded alloys. We navigated what we thought was the least obstructed channel and resolved the ambiguous alloy issue and the offgrade issue which as to Kaiser was without ambiguity,

**242**

both together under the most favored nation theory.

Defendant's motions now raise some uncertainty about Reynolds' treatment of offgrade and we can no longer view the offgrade issue as clearly settled under the most favored nation theory; however, we find the solution to the offgrade issue in the contract terms as we have construed and still construe them. What we said regarding Article I of the contracts and its lack of ambiguity on the offgrade issue is still valid and defendant has presented nothing in its motion to the contrary. Rule 69(b)(2) is not intended for the reopening of cases that have been correctly decided under the applicable facts and law.

If our suppositions about Reynolds were wrong, we think the error came about notwithstanding good faith on the part of all concerned in this lengthy and complex litigation.

We now hold that Kaiser is and was entitled to recover on the offgrade issue because of defendant's breach of contract in not allowing Kaiser to exclude offgrade in measuring its "additional production" under Article I of the contract. Defendant's motions are denied and the judgment that Kaiser has recovered in this case will stand.

Following oral argument, defendant was allowed to file an affidavit which plaintiff has moved to strike. That motion is allowed because, in the view we take of the case, the content of the affidavit is irrelevant. It offers an explanation why defendant did not put in issue the accounting treatment of Reynolds' production: the result we reach is unaffected by this. Plaintiff has made another motion in case the motion above mentioned is overruled, but action on that motion is not required, the contingency on which it was made not having arisen.

LARAMORE, DURFEE, DAVIS, and SKELTON, Judges, concur in the foregoing opinion.

COWEN, Chief Judge, concurring in the result:

I concur in the result reached by the court, but I would deny the defendant's motions on the ground that it has failed to make the showing that would justify granting relief under our Rule 69(b).

Rule 69(b), which for all practical purposes is identical to Federal Rule of Civil Procedure 60(b), provides in pertinent part as follows:

[T]he court may relieve a party * * * from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 68(c); * * *

Relief under this rule is discretionary with the court. Since the rule provides for extraordinary relief, the courts have uniformly held that it may be invoked only upon a showing of exceptional circumstances. Flett v. W. A. Alexander & Co., 302 F.2d 321 (7th Cir.1962), cert. denied, 371 U.S. 841, 83 S.Ct. 71, 9 L. Ed.2d 77 (1962), and cases cited therein.

Defendant claims that the court erred in holding that Kaiser was entitled to recover under its "most favored nations" agreement with the Government, because, defendant says, the court made a factual mistake in finding that Reynolds Metals Company was permitted to exclude offgrade metal from its computations of contract production, whereas Kaiser included such metal in its contract production computations. But the defendant has not made a clear showing that such a mistake occurred. All defendant presently knows is that Reynolds Metals Company has filed a suit in this court claiming that it did not exclude offgrade metal, except for 30,-839,082 pounds produced at its San Patricio Plant. Defendant asserts that the offgrade material excluded by Reynolds was "starter" material and that this practice was followed by Kaiser and the other companies.

There is nothing new or exceptional in the Government's contentions regarding Reynolds' practices and the Government has clearly failed to establish that the court erred in its factual determinations in this case. Among the papers submitted with defendant's motions is a copy of a letter dated July 11, 1968, from Reynolds Metals Company to the General Services Administration, containing a quotation from a letter written on May 9, 1958, by the Administrator of the General Services Administration to the Comptroller General, when the latter was considering Kaiser's claim. The letter quoted from is included in the record of this case as Defendant's Exhibit 201 for Identification. It shows that five years before Kaiser filed suit, GSA had determined that Reynolds had not excluded *all* offgrade metal from its contract production computations; that Reynolds was disputing Kaiser's claim that Reynolds had been given favored treatment by being allowed to exclude the subpurity metal, and that Reynolds had informed the Government that if Kaiser were permitted to recompute its production by excluding the offgrade metal, Reynolds would insist upon the same treatment. Although Defendant's Exhibit 201 was not admitted in evidence, a statement substantially to the same effect was contained in Plaintiff's Exhibit 53, a letter from the Comptroller General dated June 6, 1958. Plaintiff's Exhibit 53 was not only considered at the trial but was included in defendant's proposed findings of fact to the trial commissioner (defendant's requested finding 36, page 40, Defendant's Proposed Findings of Fact, filed November 5, 1965). In view of these circumstances and the extensive transcript and supporting documents, I do not think we should grant the defendant's motion on the ground of mistake, since the Government has not substantiated by adequate proof what factual errors were made, Thomas v. Colorado Trust Deed Funds, Inc., 366 F.2d 136 (10th Cir. 1966).

As I read the defendant's motions, the Government's principal basis for obtaining the relief sought under Rule 69(b) is "excusable neglect." The defendant says that in view of the action filed by Reynolds and the contentions made by it, it is now essential to make an accurate determination regarding Reynolds' treatment of offgrade metal and that Reynolds' record, which provide the best evidence on this point, were never before the court. The affidavit of defendant's attorney states that when she was assigned to the case, she was informed by the General Services Administration that Mr. William G. Magee, one of the Government's principal witnesses in the case, was the most knowledgeable person in the GSA on the subject of the aluminum supply contracts in issue. Her affidavit further states that Mr. Magee had advised her that Kaiser was correct in its contention that Reynolds was computing production by excluding the offgrade metal.[1] She also avers that, in view of the pressure under which trial preparation was required to proceed, she did not have the time to obtain accurate information about Reynolds' accounting practices and believed that the correct answer had already been supplied by Mr. Magee. A review of Mr. Magee's indefinite testimony indicates that he did not make a thorough study of the data that was available to the Government regarding Reynolds' treatment of offgrade metal production during the years in question and that without such a study, he was unable to recall many of the important facts relating to this matter. Under these circumstances, the question before us is whether we should now allow the Government to retry the case and introduce evidence which the Government says *may* show factual infirmities in the court's findings, when the defendant made no effort to obtain such evidence for presen-

---

1. The affidavit does not state and there is nothing in the record to show that Mr. Magee ever stated or reported that Reynolds had excluded *all* such offgrade metal.

tation at the trial. It seems to me that this question should be answered in the negative.

The record is entirely clear that the Government should have been on notice that Reynolds' accounting practices, with respect to its treatment of offgrade metal in its contract production, were essential to the defense of Kaiser's suit in this court. The initial pleading filed in 1963 contains the allegation that Kaiser believed that Reynolds had excluded the offgrade aluminum. I have already referred to Defendant's Exhibit 201 and to Plaintiff's Exhibit 53, a document of similar import. It is quite apparent from the lengthy letter of May 9, 1958 (Defendant's Exhibit 201), that GSA then well knew the nature of Kaiser's claims and rejected them; that it then realized that if it did not reject them, Reynolds would dispute the factual basis of the Kaiser claim and would insist on entitlement to any allowances made to Kaiser on that account. As previously stated, this letter was available to defendant five years before this suit was filed, and it should have alerted the Government to the factual disputes that would arise when Kaiser undertook to prove that Reynolds had been given preferential treatment. Yet so far as appears, nothing was done to obtain from Reynolds evidence of the factual basis upon which Reynolds disputed Kaiser's claim of preferential treatment.

There is also in the record a document, Plaintiff's Exhibit 179, which is a summary of Reynolds' contract production at San Patricio. The summary was prepared by Mr. Magee and shows that during the start-up production at San Patricio, 32,249,977 pounds of offgrade metal were produced and not included as a part of contract production. It is apparent that this document was in the hands of the Government long before Kaiser saw it, and since it put the Government on notice that Reynolds had excluded some offgrade production, it seems to me that the information should have alerted the Government to the desirability and necessity of finding out how much offgrade metal Reynolds excluded from its contract production and how much, if any, it included in that production. But, again, it appears that the Government did not feel it necessary to obtain the complete facts on this element of its defense.

Since defendant's attorney says that she relied on Mr. Magee's advice, attention is directed to his deposition which was taken for discovery purposes on January 29, 1964. Since Mr. Magee testified at the trial, the deposition was not admitted in evidence. The deposition is pertinent, however, in determining whether the defendant's reliance on Mr. Magee's indefinite statements and uncertain recollection constituted "excusable neglect," which justified the Government's failure to comb its own records or those of Reynolds Metals Company for an accurate determination of Reynolds' treatment of offgrade metal. Mr. Magee could not recall the details of his own work and could not remember what Reynolds had or had not done with respect to some or all of its offgrade production. Thus:

Q [by plaintiff's counsel] And the information you had at that time was, in reporting production, Reynolds had excluded some metal which you described as starter metal.

A [by Mr. Magee] Well, you've had access to the report. I haven't seen it for a long time. You apparently have reviewed it very recently, since you're aware of it. I wouldn't want to say when it was taken out, how much it was or to what extent.

\* \* \* \* \* \*

Q All right. Do you know for how long a period this production of so-called starter metal continued at Reynolds?

A No, sir, I do not.

Q Do you know what period of time was covered by this exclusion of starter metal?

A No, sir, I do not.

Q Now—

A   Not from memory, I must say, but it may be in the records.

Since this deposition was taken almost a year before the trial began, it is very difficult to understand why the Government was surprised at the trial by the fact that Mr. Magee's testimony was not of overwhelming value to the defense.   More to the point, however,`I think the deposition dispels the notion that the Government could justifiably rely on Mr. Magee's recollection and advice, to the extent of excluding any thought of ascertaining the complete facts about Reynolds' practices from documentary records.   If the information needed was not already in the possession of the Government in the form of auditing reports routinely made in the course of administering the contracts, Reynolds' files and the person in charge of keeping its records could have been subpoenaed under the rules of the court.

I realize that this is an extremely complicated case and that defendant's attorney may not have had all of the time that she desired.   Nevertheless, the case was filed in 1963, did not go to trial until December 1964, and final judgment was not entered until December 15, 1967.   Under the circumstances recited above and in the light of the authorities which have considered similar applications for relief, it seems to me that the defendant's omission to obtain and present the evidence, which it says the court should have had before it, is not "excusable neglect."   Farmers Cooperative Elevator Ass'n v. Strand, 382 F.2d 224 (8th Cir.1967), cert. denied, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659 (1967); Greenspahn v. Jos. E. Seagram & Sons, 186 F.2d 616 (2d Cir. 1951); Plisco v. Union R.R. Co., 379 F. 2d 15 (3rd Cir.1967), cert. denied, 389 U.S. 1014, 88 S.Ct. 590, 19 L.Ed.2d 660 (1967); Kahle v. Amtorg Trading Corp., 13 F.R.D. 107 (D. N.J. 1952).

I do not understand that the defendant is claiming relief from the judgment on the ground of newly discovered evidence.   In any event, it is apparent that it is not now offering to produce evidence which was not available at the time of the trial or which could not have been discovered by the exercise of reasonable diligence prior to the trial.

Any court is necessarily concerned when a responsible attorney alleges that it has reached an incorrect result because of a mistaken determination of the facts of a case.   However, the facts in any litigation must be decided on the basis of the evidence produced by the litigants in that particuar case.   It may well be that if the case were retried, the Government could present a stronger and more effective defense, but to make a litigation an open-end proposition jeopardizes the confidence which litigants can place in a court's ability to render a final judgment.   To be sure, there are exceptional circumstances under which judgments should be set aside when an adequate showing is made under Rule 69(b).   In the absence of such a showing, the time comes when a court must stick by the judgment it rendered so that the parties are finally put at rest about their respective rights and obligations as the court determined them.

It is rare indeed to find an attorney on the losing side of any vigorously contested case, who cannot make an appealing argument that if he had had more time, if he had not overlooked certain matters, or if he had had more assistance from his client, he would have won the case.   But these are not the grounds upon which courts grant relief from a judgment under a rule like our Rule 69(b).   When all is said and done, it seems to me that the Government here is asking for a retrial, because its attorney did not have the time and help needed for an adequate presentation of its defense.   I do not question the good faith or the sincerity of the Government's conscientious attorney.   She was the second attorney assigned to represent the Government in this case, and I do not doubt that she exerted every effort, under difficult conditions, to do what she thought best for her client.   I sympathize with her because the record

indicates that she had to carry the entire burden of preparing for and trying a lengthy and complicated case without the help of any other attorney. If the Government's defense was deficient on that account, the responsibility lies with those who are charged with the protection of the Government's interests in litigation. This is a burden which the court cannot and should not assume. In the interest of judicial economy, in fairness to the parties, and in fairness to other litigants waiting to have their cases decided, we should not allow the parties to try and retry cases, especially cases like this which have already consumed so much time, expense, and effort, unless it is demonstrated that exceptional circumstances, contemplated by our Rule 69(b), justify such action.

LARAMORE, DURFEE, and COLLINS, Judges, concur in the foregoing concurring opinion of the Chief Judge.

LARAMORE, Judge, concurring in the result:

I agree with Judge Nichols' opinion. I also agree with the concurring opinion of the Chief Judge concurring in the result, but would add this—that this court was correct in its original opinion based on the facts then before us, and defendant, by its motion, has not presented any new fact.

DURFEE, Judge, concurs in the foregoing concurring opinion of Judge Laramore.

DURFEE, Judge (concurring):

I concur with the majority opinion of the court that plaintiff is entitled to recover on the off-grade issue under the contract, as construed by the court under the applicable facts and the law.

I also concur with the concurring opinion by the Chief Judge on the ground that defendant's motion for relief from the judgment under Rule 69(b) should be denied because of the failure of defendant to demonstrate that there are exceptional circumstances contem-

plated and required by the Rule, which would justify granting the motion.

I also concur with the additional factor pointed out by Judge Laramore that the court was correct in its original opinion and defendant, by its motion, has not presented any new fact.