## ALUMINUM COMPANY OF AMERICA

v.

### The UNITED STATES.

### Nos. 260–81C, 261–81C and 262–81C.

United States Claims Court.

June 29, 1983.

772

Christopher T. Lutz, Washington, D.C., for plaintiff. Steptoe & Johnson, Washington, D.C., of counsel.

Sara V. Greenberg, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

WOOD, Judge.

In these three consolidated cases, plaintiff seeks review, under the familiar standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976), of a decision of the General Services Administration Board of Contract Appeals ("GSBCA" or "the Board") denying each of three separate, timely appeals from a decision of the contracting officer under General Services Administration Contract No. GS–00P–(DS)–11163 ("the contract").[1]

In general terms, the contract, executed effective November 1, 1965, dealt with the

1. Appeals of the Aluminum Company of America, GSBCA Nos. 4728, 4764, and 5024, 80–1 BCA (CCH) ¶ 14,362 (1980).

sale to plaintiff by defendant of excess aluminum from the strategic minerals stockpile authorized by the terms of the Defense Production Act, 50 U.S.C.App. §§ 2061–2166 (1964), and implementing regulations. Although each of the three cases now before the court arises out of the same general factual background, and involves the same contract, the issues here presented arose over a period of years, and each case presents a separate and distinct controversy. To facilitate understanding, the factual setting out of which all the controversies arose, and the relevant contractual provisions, will be set forth at the outset.[2] Thereafter, the facts and the nature of the controversy in each case will be delineated, and the separate controversies will be resolved, in the order in which the parties have briefed them.

For the reasons hereinafter appearing, plaintiff's motion for summary judgment is granted in Docket No. 262–81C but denied in Docket Nos. 261–81C and 260–81C, and defendant's cross-motion for summary judgment is denied in Docket No. 262–81C but granted in Docket Nos. 261–81C and 260–81C.

I

The General Factual Background

During the Korean emergency, a governmental determination that the national defense required (among other things) a large strategic stockpile of aluminum was made. In consequence, defendant, acting through the General Services Administration, entered into contracts with several major producers of aluminum (including plaintiff) for government purchases of substantial quantities of the aluminum those contractors produced. Pursuant to those contracts, defendant purchased, and stockpiled, several million tons of aluminum.[3]

By the mid-1960's, however, defendant had determined that it no longer needed to maintain such huge amounts of aluminum in the strategic minerals stockpile. Accordingly, legislative authority to dispose of excess stockpile aluminum was sought and obtained. In an effort to minimize the harmful impact of a disposal program of such magnitude, the authorizing legislation (Pub.L. 89–460, 89th Cong., 1st Sess., 80 Stat. 212, approved June 21, 1966) provided that the time and method of disposition should be fixed "with due regard to the protection of the United States against avoidable loss and the protection of producers, processors and consumers against avoidable disruption of their usual markets."

In implementation of the disposal program, defendant and a number of aluminum producers (collectively referred to as "Participating Purchasers" or "Purchasers") entered into individual, but essentially identical, contracts with respect to the sale and purchase of the excess stockpile aluminum. Each Participating Purchaser agreed to purchase a pro rata share of the entire quantity of excess stockpile aluminum to be sold. Article I, paragraph 3, of plaintiff's contract prescribed the percentage share of each Participating Purchaser, and indicated that those shares were "determined on the basis of [the Participating Purchasers' respective] percentages of Installed Aluminum Reduction Capacity." Plaintiff's stated percentage share was 29.4 percent, the largest assigned to any Participating Purchaser. The Participating Purchasers included Harvey Aluminum Incorporated, and Aluminum Limited, Inc.[4]

**2.** Unless otherwise indicated, the facts stated herein were found by the Board or are properly derived from uncontroverted evidence. *See Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 649, n. 3, 609 F.2d 462, 467, n. 3 (1979).

**3.** *See,* generally, *Kaiser Aluminum & Chemical Corp. v. United States,* 181 Ct.Cl. 902, 388 F.2d 317 (1967); *id.,* 187 Ct.Cl. 443, 409 F.2d 238 (1969); *see* also *Reynolds Metals Co. v. United*

*States,* 194 Ct.Cl. 309, 438 F.2d 983, *cert. denied,* 404 U.S. 825, 92 S.Ct. 55, 30 L.Ed.2d 54 (1971).

**4.** Aluminum Limited, Inc., was assigned and accepted a 10 percent pro rata share; its contract with defendant was also executed as of November 1, 1965. By an agreement, dated December 10, 1968, Alcan Aluminum Incorporated (Alcan), corporate successor to Aluminum Limited, Inc., assumed the latter's obliga-

Article X, paragraph 1(a), of plaintiff's contract provided in part as follows:

1(a). The price at which Purchaser agrees to purchase aluminum hereunder shall be Purchaser's published U.S. domestic price * * * in effect at the date of delivery * * * provided, however, that if on the date of delivery the current published U.S. domestic price * * * for the grade, form, size, and quantity involved of any other Participating Purchaser is lower than Purchaser's published U.S. domestic price, then, and during the period of such differential, such lowest published price shall be used in lieu of Purchaser's published price * * *. If on the 30th day after the date of any delivery, the applicable published price determined in accordance with this subparagraph (a) is higher or lower than the applicable published price in effect on the date of delivery, the price of any such delivery shall be adjusted by the amount of such difference.[5]

Article XI, paragraph 4(a) of plaintiff's contract, the so-called "most favored nation" clause, provided as follows:

4. *Amendments.* (a) The Government agrees that if it amends any contract with another Participating Purchaser or waives any material right against any Participating Purchaser, it will within 30 days of such amendment or such waiver offer to Purchaser an amendment to this Contract incorporating the same terms and provisions or a waiver of the same right, as the case may be. Such offer must be acted upon by Purchaser within 30 days thereafter.

Article XII, paragraph 1, provided in part as follows:

1. *Delivery and Shipping Instructions.* Purchaser shall, prior to the desired dates of shipment, furnish the Government with a schedule of desired deliveries and destinations. The Government will with-

in 10 days after receipt of delivery information from the Purchaser notify the Purchaser as to the specific storage locations from which shipment will be made. After receipt of notice from the Government of the depot or depots from which shipments of aluminum hereunder are to be made, but at least 15 days prior to the desired initial delivery date, Purchaser shall furnish the Government complete shipping and document distribution instructions and the necessary commercial bills of lading where required to accomplish shipment, including, but not limited to, designation of type and kind of conveyance, carrier routing, minimum load per conveyance, shipping schedule and any other pertinent instructions. * * * The above instructions shall be addressed to General Services Administration, Defense Materials Service, Stockpile Division, General Services Building, Washington, D.C. 20405. The Government will deliver aluminum sold hereunder in accordance with Purchaser's shipping instructions.

Docket No. 262–81C, in which plaintiff challenges the GSBCA's ruling in Appeal No. 4728, involves Article X, paragraph 1(a) and particularly its so-called "reach-back" proviso. Docket No. 261–81C, in which the GSBCA's ruling in Appeal No. 4764 is challenged, requires examination of both Article X, paragraph 1(a), and the Delivery and Shipping Instructions clause. Docket No. 260–81C (concerning the administrative ruling in Appeal No. 5024) focuses entirely on the most favored nation clause.

II

Docket No. 262–81C

Docket No. 262–81C requires a determination of the proper price under the contract for certain aluminum delivered by defendant to plaintiff between December 24,

---

tions under the said contract. That contract is hereinafter called the Alcan contract. *See* Section IV, *infra.*

**5.** The parties agree that "delivery" of a quantity of aluminum purchased by plaintiff occurred at the time of its shipment free on board from a particular GSA storage location. The date of any particular "delivery" was thus the date of the shipment f.o.b.

1968, and January 16, 1969. The facts essential to resolution of that question are undisputed. *See* note 1, *supra.*

Between December 24, 1968, and January 16, 1969, defendant delivered to plaintiff 7,703,689 pounds of aluminum ingot. As of January 17, 1969, every Participating Purchaser (including plaintiff) except Harvey Aluminum Incorporated had raised its price for aluminum ingot to 27 cents per pound. Harvey's published price for aluminum ingot (26 cents per pound, effective June 8, 1968) had not, however, been changed. As the Board explicitly found, "as of late January, 1969, Harvey had not decided whether to join the price increases of the other aluminum producers," and in fact "did not promulgate its price increase from 26 cents to 27 cents until February 15, 1969."

In January 1969, defendant billed plaintiff for the 7,703,689 pounds of aluminum here relevant at a price of 26 cents per pound. Plaintiff timely paid defendant the amounts so billed. In a price sheet for aluminum ingot transmitted by Harvey to GSA by an announcement dated February 15, 1969, Harvey indicated that the price of its unalloyed aluminum ingot was increased by one cent per pound, from 26 to 27 cents, effective January 17, 1969.

Some seven years thereafter, GSA took the position that because of Harvey's retroactive price increase, and the reach-back proviso in Article X, paragraph 1(a), plaintiff owed it an additional one cent per pound, or a total of $77,036.89, for the 7,703,689 pounds of aluminum delivered by GSA to plaintiff in the 30-day period prior to January 17, 1969, and billed plaintiff accordingly. Plaintiff declined to make the

payment assessed, and the contracting officer rendered a decision affirming the assessment. The matter was thereafter appealed to the Board.[6]

By the terms of Article X, paragraph 1(a), plaintiff agreed to purchase aluminum at its own or any lower Participating Purchaser's current published U.S. domestic price in effect on the date of delivery—subject, however, to the reach-back proviso hereinbelow discussed. On the date of every delivery of aluminum to plaintiff between December 24, 1968, and January 16, 1969, the lowest Participating Purchaser's current published U.S. domestic price was the 26 cents per pound price Harvey had published in June 1968. If, on the 30th day after the date of any such delivery, "the applicable published price determined in accordance with this subparagraph (a) is higher or lower than the applicable published price in effect on the date of delivery," however, the price of the delivery was to be adjusted by the amount of the difference.

Plaintiff contended administratively that on the 30th day after the date of any delivery to it here relevant,[7] the "applicable published price determined in accordance with this subparagraph (a)" was 26 cents per pound, the same price that was "in effect on the date of [any such] delivery," and that defendant's effort to utilize the reach-back proviso to impose upon plaintiff a retroactive change in contract price with respect to deliveries more than 30 days prior to February 15, 1969, was legally erroneous and improper.

Defendant took the position that under a proper interpretation of Article X, para-

---

6. The Board overruled plaintiff's objections that the Board lacked jurisdiction, and that the government claim for payment was in any event time-barred. Appeal of Aluminum Company of America, GSBCA No. 4728, 77–2 BCA (CCH) ¶ 12,830 (1977). Thereafter, the matter proceeded to administrative decision on the merits. Plaintiff suggests that the administrative proceedings "were in the nature of declaratory judgments", but states without contradiction that it has paid the amount sought to be recovered in Docket No. 262–81C. Defendant does not question jurisdiction. While consent of the parties cannot confer jurisdiction, the

case is deemed one well within the purview of Section 1491, Title 28, United States Code, as amended.

7. *I.e.,* any delivery more than 30 days prior to Harvey's February 15, 1969, announcement of a price increase. Plaintiff errs, however, in suggesting here that the "30th day after January 16 is February 14, 1969." *See, e.g., Burnet v. Willingham Loan & Trust Co.,* 282 U.S. 437, 439, 51 S.Ct. 185, 185, 75 L.Ed. 448 (1931); *Fogel v. Commissioner,* 203 F.2d 347, 349 (5th Cir.1953).

graph 1(a), the applicable purchase price for any delivery of aluminum to plaintiff during the 30-day period prior to January 17, 1969, the stated effective date of Harvey's price increase, was properly subject to adjustment by the amount of that increase. The Board accepted defendant's argument (albeit with little or no reasoned discussion of the language of the contract proviso under scrutiny), and denied plaintiff's appeal.

■ The administrative decision under review in Docket No. 262–81C rested basically upon an interpretation of the contract. Although that interpretation deserves careful consideration and all due respect, deciding what a contract means is a judicial function, and in performing that function the court is in no way bound by the Board's legal conclusions. *B.D. Click Co. v. United States,* 222 Ct.Cl. 290, 297–98, 614 F.2d 748, 752–53 (1980); *Monroe M. Tapper & Associates v. United States,* 221 Ct.Cl. 27, 31, 602 F.2d 311, 313 (1979); *George Hyman Constr. Co. v. United States,* 215 Ct.Cl. 70, 80, 564 F.2d 939, 944 (1977); *Timber Access Industries Co. v. United States,* 213 Ct.Cl. 648, 654, 553 F.2d 1250, 1253 (1977).

■ One of plaintiff's contentions is that the Board's holding respecting the impact of the reach-back proviso upon the price of the 7,703,689 pounds of aluminum here relevant is legally erroneous, in that it ignores the plain language of Article X, paragraph 1(a), and accordingly is not entitled to finality. Following a careful consideration of plaintiff's and defendant's arguments, the Board decision, the administrative record, and the relevant authorities, it is concluded that plaintiff is right.

Where the provisions of a contract are phrased in clear and unambiguous language, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties * * *." *Elden v. United States,* 223 Ct.Cl. 239, 252, 617 F.2d 254, 260–61 (1980), and cases there cited. *See also American Science and Engineering Inc. v. United States,* 229 Ct.Cl. ——, ——, 663 F.2d 82, 88 (1981). Where the language

of a contract is clear, its "words are to be given their plain and ordinary meanings." *Timber Access Industries Co. v. United States, supra,* 213 Ct.Cl. at 658, 553 F.2d at 1256. Upon a careful scrutiny of Article X, paragraph 1(a), its words are clear and unambiguous, and its meaning is plain.

In brief terms, the contract provided that plaintiff would pay defendant, for aluminum purchased under the contract, its own "published U.S. domestic price * * * in effect at the date of delivery," except that, if there were any lower "current published domestic U.S. price * * * of any other Participating Purchaser * * * " in effect on the date of delivery, *that* currently published price would be paid. The price thus determined was "the applicable published price in effect on the date of delivery."

The contract went on to provide that if, "on the 30th day after the date of any delivery, *the applicable published price determined in accordance with this subparagraph (a)* is higher or lower than *the applicable published price in effect on the date of delivery,*" an adjustment in the price of that delivery would be made (emphasis supplied). Both of the emphasized phrases must be read in light of subparagraph (a)'s concomitant reference to a *"current published* U.S. domestic price"; so construed, they do not encompass a "price" fixed retroactively, more than 30 days after the date of a particular delivery, and *a fortiori* not "published" on, or within 30 days after, the date of that delivery.

Put another way, under the reach-back proviso "the applicable published price in effect on the date of [any] delivery" could be "adjusted," but such an adjustment was authorized only if, on the 30th day after the date of that delivery, a higher or lower "applicable published price determined in accordance with this subparagraph (a)" was actually "in effect." Article X, paragraph 1(a), plainly did not provide, and cannot properly be read to mean, that the applicable purchase price in effect on the date of a particular delivery could be "adjusted" 31, 60, 90, or even 1,000 days *after* the date of a delivery simply by reason of an announce-

ment by another Participating Purchaser that it had retroactively changed its price for aluminum.

Plaintiff also points to what may fairly be termed contemporaneous "external indications of the parties' joint understanding * * * of what the contract imported." *Macke Co. v. United States,* 199 Ct.Cl. 552, 556, 467 F.2d 1323, 1325 (1972). It asserts, in essence, that "how the parties act[ed] under the arrangement, before the advent of controversy * * *," is a significant indication of the meaning and intent of the reach-back proviso, and that the Board erred in unjustifiably dismissing the documentary evidence outlined in the next paragraph.

In March 1969, the Chief, Metals Branch, Stockpile Disposal Division, GSA, addressed to the Chief, Accounts Receivable Branch, GSA, a memorandum captioned "Change in Price of Aluminum Ingot." The said memorandum notes an increase of one cent per pound in the price of aluminum ingot "effective February 16," encloses "a copy of a price list from Harvey Aluminum which shows the current prices for aluminum ingot for delivery under each of * * * " several contracts, including plaintiff's contract with defendant, and concludes as follows:

> In accordance with the terms of our contracts with these seven companies, you should increase the price by 1.0 cent per pound for all shipments that have been made during the 30-day period prior to February 16.

It could properly be said that the construction of the contract just described is "entitled to great weight in its interpretation." *State of Arizona v. United States,* 216 Ct.Cl. 221, 236, 575 F.2d 855, 863 (1978); *Macke Co. v. United States, supra.* It is, however, unnecessary to rest this opinion on that contemporaneous external indication of the contract's meaning, because the con-

tract language itself is clear and unambiguous, and therefore to be given its plain and ordinary meaning. In failing to do so, the Board erred as a matter of law.

In light of the foregoing, the Board's denial of plaintiff's appeal of GSA's assessment of an adjustment under Article X, paragraph 1(a) does not deserve finality, and is reversed. Plaintiff's motion for summary judgment in Docket No. 262–81C is accordingly granted, and defendant's cross-motion for summary judgment in Docket No. 262–81C is denied.[8] Judgment will be entered in plaintiff's favor in Docket No. 262–81C for $77,036.89, the sum assessed against and paid by plaintiff in consequence of defendant's imposition of an additional one cent per pound charge on the 7,703,689 pounds of aluminum ingot delivered to plaintiff between December 24, 1968, and January 16, 1969.[9]

## III

### Docket No. 261–81C

Docket No. 261–81C requires a determination of the proper price under the contract for certain aluminum delivered by defendant to plaintiff in May 1976. Here, too, the facts essential to resolution of that question are undisputed. *See* note 1, *supra.*

Under the contract (as modified by Amendment No. 3, effective July 1, 1972), plaintiff was required to purchase a minimum fixed amount of aluminum each fiscal year, except that, in the last fiscal year, plaintiff was to purchase the undelivered balance of the total amount it had agreed to purchase. In January 1976, the parties began to discuss the exact quantity remaining to be purchased by plaintiff, and on April 6, 1976, oral agreement that a purchase obligation of 5,556,613 pounds remained to be met was reached.

---

**8.** Plaintiff also advances a number of other arguments in Docket No. 262–81C. In view of the ruling hereinabove, those arguments too need not be, and are not, reached.

**9.** Plaintiff's brief also claims "applicable interest" in Docket No. 262–81C. Plaintiff does not,

however, furnish any basis, contractual or otherwise, upon which the interest claim might properly be allowed, and it is accordingly denied. *Monroe M. Tapper & Assoc. v. United States,* 222 Ct.Cl. 34, 37, 611 F.2d 354, 357 (1979).

Article XII, paragraph 1, quoted above, provided that "prior to the desired dates of shipment," plaintiff would furnish to defendant a "schedule of desired deliveries and destinations." Within 10 days thereafter, defendant was to notify plaintiff of the "specific storage locations from which shipments will be made." Thereafter, but "at least 15 days prior to the desired initial delivery date," plaintiff was to furnish to GSA complete shipping and document distribution instructions and any other requisite documentation to accomplish shipment.

On April 8, 1976, the person responsible for placing plaintiff's orders under the contract informed a secretary in plaintiff's Washington, D.C., office, by telephone, of the details of plaintiff's final orders of aluminum under the contract. That secretary then typed the information she had been given on two stockpile order forms.[10] One stockpile order form requested delivery of more than 2,000,000 pounds of aluminum to a location in Texas; the other requested delivery of more than 3,000,000 pounds of aluminum to a location in Indiana.

Under the caption "Delivery Schedule," each stockpile order form contained the following words: "To be shipped as soon as possible upon receipt of the order and the material to be shipped complete prior to 4/30/76." The stockpile order forms were hand-carried to GSA's offices at 2000 L Street, N.W., Washington, D.C., arriving there (in the Board's words) "on or about April 8 * * *." On April 14, 1976, two GSA officials, one of whom was the contracting officer, signed or initialed copies of these forms and returned them to plaintiff.

On April 9, 1976, completed purchase orders were taken to plaintiff's mail room in Pittsburgh, Pennsylvania, for mailing to its Washington, D.C. office, from which they were to be hand-carried to GSA. The GSBCA found that the purchase orders reached a GSA storage officer in Crystal City, Virginia, on April 16, 1976, but observed that "that is hardly conclusive of the question of the date on which [plaintiff] 'furnish[ed] [defendant] complete shipping and document distribution instructions * * *.'" Elsewhere, the Board held that "we need not decide the date of GSA's receipt of the purchase order."

GSA was able to deliver to plaintiff approximately 60 percent (or about 3,500,000 pounds) of the aluminum plaintiff had ordered from the GSA stockpile in April prior to April 30, 1976. The remainder (1,934,623 pounds) was delivered between May 3 and May 7, 1976.[11] The actual dates of delivery fell within the 30-day period preceding a price increase for the grades of aluminum delivered of from three to three and one half cents per pound effective June 1, 1976.

Had all of the aluminum ordered been delivered by April 30, 1976, as plaintiff had requested, its price would have been $59,-627.68 less than the amount ultimately paid to defendant for it.[12] If the price properly to be charged under Article X, paragraph 1(a), for deliveries after April 30, 1976, is "the applicable published price in effect" on the actual dates of delivery, "adjusted" upward pursuant to the reach-back proviso by the applicable amounts of the June 1, 1976, price increases, plaintiff is not entitled to any recovery in Docket No. 261–81C.

There can be and is no doubt that under Article X, paragraph 1(a), read literally, the price due for the aluminum delivered to plaintiff in May 1976 is an "adjusted" price encompassing, through application of the reach-back proviso, the increases in price of

---

10. The person responsible for placing plaintiff's orders under the contract had signed these forms in blank.

11. This was in fact the last aluminum delivered to plaintiff under the contract. *See* Section IV, *infra.* The various sets of numbers used by the Board from time to time are not entirely consistent, but the discrepancies are, for present purposes, irrelevant.

12. As in Docket No. 262–81C, GSA billed plaintiff for the aluminum on the basis of the increased prices; plaintiff refused to pay as billed; the contracting officer issued a decision upholding GSA's position; and the matter was then appealed to the GSBCA. Following denial of plaintiff's appeal, plaintiff paid defendant the amount here claimed, and then filed suit to recover it. *See* note 6, *supra.*

such aluminum effective June 1, 1976. Before the Board, however, plaintiff contended that under *Deloro Smelting and Refining Co. v. United States,* 161 Ct.Cl. 489, 317 F.2d 382 (1963), defendant was entitled to no more than the "applicable published price" in effect as of April 30, 1976, the date on which (in plaintiff's view), all deliveries under the contract were due. The Board disagreed. It concluded that *Deloro* was distinguishable, and that under a proper interpretation of the contract defendant was "entitled to charge the prices in effect on the date of actual delivery."

Plaintiff asserts that the Board erred as a matter of law in distinguishing *Deloro* and in its interpretation of the contract, and that the decision under review in Docket No. 261–81C should therefore be reversed.[13] While those administrative decisions in no way preclude the court from construing the contract independently, *B.D. Click Co. v. United States, supra,* it is concluded that, as defendant contends, the result reached by the Board is right.

In *Deloro,* defendant wanted to acquire and store cobalt as a part of its federal stockpile program. Plaintiff, a Canadian smelting company, agreed to deliver cobalt to the government in conformity with a specified delivery schedule. The price to be paid for the cobalt was (in simplified terms) to be derived from the domestic United States market price "as of the date of delivery of the cobalt metal" and the applicable exchange rate "at the date of delivery." *Ibid,* 161 Ct.Cl. at 493, 317 F.2d at 384–85. When failures to comply with the delivery schedule occurred, defendant took the position that price computations should be made "as of" or "at" the date of a scheduled delivery rather than "as of," or "at" the unjustifiably delayed dates of actual delivery.[14]

In *Deloro,* the court held that the contract "did not provide for escalation for deliveries which were unexcusedly late,"
but rather "fixed the price as of the due date * * * " for a delivery. *Ibid., 161* Ct.Cl. at 497, 317 F.2d at 387. The holding was founded on the only guide to meaning available to the court in that case, the "traditional principle that the contract words [in dispute] must be interpreted as they would probably be understood by reasonable men standing in the parties' shoes." *Ibid,* 161 Ct.Cl. at 495; 317 F.2d at 386; *see* also *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The court added that practical business sense precluded an interpretation that would permit the plaintiff in *Deloro* to reap a financial windfall from its own unexcused delay.

■ Plaintiff's effort to force this case within the mold of *Deloro* rests essentially on the proposition that its contract required delivery of the entire quantity of aluminum ordered from GSA no later than April 30, 1976, and that, for pricing purposes, "the date of delivery" in Article X, paragraph 1(a) therefore meant "the *due* date of delivery," not the actual dates of deliveries that were "late past the dates [plaintiff] sought in its ordering documents." The Board did not err in concluding otherwise.

The factual situation in this case is indeed sharply distinguishable from that present in *Deloro.* In this case, defendant plainly had no "malevolent incentive * * * deliberately to postpone performance in order to increase its recovery"; the cornerstone of the holding in *Deloro* simply is not present here. *Deloro Smelting and Refining Co. v. United States, supra,* 161 Ct.Cl. at 496, 317 F.2d at 387. That factor, in and of itself, strongly suggests that "the date of delivery" should be read here in its ordinary sense, and as an actual, not a suppositious, date.

Moreover, the contract here under consideration provided neither for fixed delivery dates nor even for the setting of such dates, at least for purposes of Article X, para-

---

**13.** Both parties agree that if plaintiff's argument is upheld, the matter should be remanded to the Board.

**14.** Price calculations based on the dates of actual delivery were, "in the main, higher * * * " than those based on scheduled delivery dates. *Ibid,* 161 Ct.Cl. at 493, 317 F.2d at 385.

graph 1(a), in the manner attempted by plaintiff in this case. Too, as the Board opinion indicates, the contract's references to "desired deliveries," and the "desired initial delivery date," also militate against plaintiff's argument that any delivery not made by April 30, 1976, was "late" (and to be priced as of April 30, 1976).

Pursuant to Article XII, paragraph (1), plaintiff had an undoubted right (and obligation) "prior to the desired dates of shipment," to furnish to defendant a "schedule of desired deliveries," and thereafter to indicate "the desired initial delivery date * * * " for the aluminum it ordered. Nothing in the contract language or reason, however, justifies the conclusion that a mere failure to deliver each and every pound of aluminum ordered on or before the "desired initial delivery date" either amounted to contravention of a fixed and certain delivery schedule or altered plaintiff's obligation, under Article X, paragraph 1(a), to make payments upon the basis of the applicable published price in effect on the *actual* date of any delivery (subject, of course, to appropriate adjustment, upward or downward, pursuant to the reach-back proviso).[15] To paraphrase *Deloro,* a price thus calculated "is the price the [plaintiff] expected and agreed to pay, and which [defendant] expected and agreed to receive." *Ibid,* 161 Ct.Cl. at 497, 317 F.2d at 387.

Accordingly, plaintiff's motion for summary judgment in Docket No. 261–81C is denied, defendant's cross-motion for summary judgment is granted, and the complaint will be dismissed.

IV

Docket No. 260–81C

In Docket No. 260–81C, the issue is whether or not the Board's interpretation of the contract's "most favored nation" clause, quoted *supra,* is right. Only the question of liability was before the Board. The relevant facts were, and are, undisputed. Here too, the question is one of law to

be decided by the court independently of the Board's decision. *B.D. Click Co. v. United States, supra.*

In essence, the most favored nation clause provided that in the event defendant either amended any contract with, or waived any material right against, any other Participating Purchaser, it would, "within 30 days of such amendment or such waiver," offer to plaintiff a contract amendment incorporating "the same terms and provisions or a waiver of the same right, as the case may be."

Plaintiff's contract and the Alcan contract (see note 4, *supra*) were, for all relevant purposes substantially identical when executed in 1965. In 1972, however, plaintiff, and most other Participating Purchasers, accepted a contract amendment (Amendment No. 3 to plaintiff's contract, effective July 1, 1972) which changed their respective purchase obligations. Alcan declined to accept that amendment.

The 1972 amendment to plaintiff's contract did not increase the total amount of plaintiff's purchase obligations under the contract, but it did have the effect of increasing plaintiff's annual purchases. Because Alcan did not accept a similar amendment, however, neither its annual purchase obligation nor its total purchase obligations under its contract with defendant increased. As a result, by June 30, 1976, plaintiff had purchased all of the aluminum it was obligated to purchase under the terms of its contract with defendant. In contrast, Alcan then had a purchase obligation of several million pounds still remaining under *its* contract.

On October 1, 1976, GSA announced that 11,532,000 short tons of aluminum had been determined to be needed for the common defense of the United States and thus required for the stockpile "goal." The stockpile then contained less than that amount of aluminum. Alcan's contract with defendant permitted it to use accumulated credits for excess purchases in earlier years to offset purchase obligations for future years.

---

15. Plaintiff's suggestion that a fixed and definite delivery schedule resulted from its stockpile order forms is inconsistent with the contract language, and devoid of common sense.

In consequence, while Alcan's remaining purchase obligation then totalled 3,370,000 pounds, it was not required by the terms of its contract to purchase any more aluminum from defendant until 1980.

In consequence, Alcan and defendant negotiated, and on February 15, 1977 executed, an amendment to Alcan's contract terminating it "with respect to any undelivered amount of Excess Stockpile aluminum under the Contract * * *," and waiving any and all government claims against Alcan "in connection with the obligations referred to * * * by reason of such termination of the Contract." In short, Alcan's remaining obligation to purchase 3,370,000 pounds of aluminum was terminated and defendant waived any and all government claims against Alcoa in connection with the terminated portion of Alcan's overall purchase obligation.

In October 1977, plaintiff asserted in writing that under the most favored nation clause of its contract it was entitled to an offer "comparable" to that offered to Alcan and incorporated in its contract by the 1977 amendment thereto. In December 1977 the contracting officer denied the claim, and plaintiff thereupon appealed to the Board.

The Board concluded that plaintiff's contract should "be interpreted for purposes of this case as if it had been amended to include * * *" the 1977 amendment to Alcan's contract, and that it would consider such an amendment to have been constructively made "effective February 15, 1977." It went on to hold, however, that the amendment thus "constructively made" simply excused plaintiff "from purchasing such aluminum as it [was] required to purchase *after* * * * February 15, 1977," and

that, since plaintiff then had no outstanding purchase obligation, the amendment "is of no benefit to Alcoa." [*Ibid.*] (emphasis supplied).

Plaintiff contends that the Board misinterpreted the most favored nation clause, and thereby erred as a matter of law, by failing to hold that pursuant to its terms plaintiff was entitled to be "relieved" of its obligation—notwithstanding that the obligation had already been fully discharged—to purchase the last 9,910,000 pounds of aluminum delivered to plaintiff under its contract with defendant.[16] Plaintiff asserts that the most favored nation clause entitled it to such a contract amendment, thereby "equalizing its position" with Alcan's, achieving what plaintiff terms "competitive equality" and "equal treatment." This line of argument has no merit.

■ The most favored nation clause plainly "did not guarantee that [plaintiff] would wind up in the same position, economically, as [Alcan] * * *." *Reynolds Metal Co. v. United States,* 194 Ct.Cl. 309, 315, 438 F.2d 983, 986 (1971). *See* also *Kaiser Aluminum & Chemical Corp. v. United States,* 152 Ct.Cl. 641, 287 F.2d 890 (1961). It entitled plaintiff to no more than the Board said: an offer to terminate its contract "with respect to any *undelivered amount* of Excess Stockpile aluminum * * *" (and a concomitant waiver of any government claims in connection with any such undelivered amounts) (emphasis supplied), not to some sort of "adjustment" competitively equivalent to the result of viewing plaintiff's purchase of the last 9,910,000 pounds of aluminum under its contract as if it had never happened.[17] That is the meaning plainly mandated by the language of

16. Plaintiff's and Alcan's respective percentage shares were 29.4 and 10.0; the figure stated is 2.94 times the 3,370,000 pounds involved in the 1977 Alcan contract amendment. Parenthetically, the aluminum involved in Docket No. 261–81C was part of the last 9,910,000 pounds of aluminum purchased by plaintiff. Part of the claim administratively was that, had plaintiff been relieved of the obligation as stated, it would not have purchased the aluminum involved in what is now Docket No. 261–81C, and that in any event assessment in that case

could not properly be asserted because of the waiver language of Alcan's 1977 contract amendment.

17. Plaintiff's complaint at the Board sought the "excess acquisition costs incurred in purchase of" that quantity of aluminum, a waiver of (among other things) the government claim asserted in Docket No. 4764 (now Docket No. 261–81C), and "the expenses incurred in prosecuting the appeal in Docket No. 4764."

the contract, and that is the meaning it is to be given.[18] *Elden v. United States, supra.*

As the Board properly held, that conclusion is not altered by the mere fact that plaintiff purchased its full 29.4 percent pro rata share under its contract, while Alcan, because of the 1977 amendment to its contract, did not, in fact, purchase the full 10 percent pro rata share accepted by its predecessor in 1965. So to hold would be to "require the unscrambling of an omelet." *Cooper v. United States,* 178 Ct.Cl. 277, 317 (1967).[19] That sort of effort was not contemplated, and is not required, by the most favored nation clause. *Kaiser Aluminum & Chemical Corp. v. United States,* 152 Ct.Cl. 641, 647, 287 F.2d 890, 893 (1961). On the facts of this case, the Board's rejection of plaintiff's arguments respecting its purchase of a larger percentage share than Alcan is legally correct, and therefore to be upheld.

Accordingly, plaintiff's motion for summary judgment in Docket No. 260–81C is denied, defendant's cross-motion is granted, and the complaint will be dismissed.

## V

### CONCLUSION

In Docket No. 262–81C, judgment will be entered for plaintiff of $77,036.89. In Docket No. 261–81C, and in Docket No. 260–81C, the complaint will be dismissed.

---

**18.** *Kaiser Aluminum & Chemical Corp. v. United States,* 181 Ct.Cl. 902, 388 F.2d 317 (1967), *reh. denied,* 187 Ct.Cl. 443, 409 F.2d 238 (1969), upon which plaintiff relies, provides no support for a contrary result.

**19.** By 1976, plaintiff had fully met its 29.4 percent share purchase obligations under the contract pursuant to a voluntary election to agree to an amendment Alcan declined to accept.

The argument that a subsequent governmental decision that Alcan need not comply with its total purchase obligation somehow violates plaintiff's rights is wholly unpersuasive. The contract cannot and should not be construed so as to require retroactive readjustments of long completed transactions, simply because of such a circumstance.